## HENRY LYONS

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa, May 13, 1891.*

1. CRIMINAL EVIDENCE—*res gestœ.* Where a number of persons act together or in concert to chastise or beat certain other persons, and one of the persons attacked is killed, expressions and statements made by some of the assailants are properly admitted in evidence on the trial of one of them for murder, as characterizing the mission on which he was engaged at the time they were made.

2. SAME—*proof of another and distinct offense—when admissible.* The general rule is, that proof of a distinct, substantive offense can not be admitted in support of a prosecution for another offense. The rule does not apply, however, when the evidence of another offense tends in some way to prove the accused guilty of the crime for which he is on trial, nor when there appears to have been a connection between the two acts in the mind of the actor, linking them together for some purpose he intended to accomplish, nor when there is such a logical connection between the two that the one tends to establish the other, nor when the two acts form but one transaction. Such testimony is also sometimes admissible to show motive or to refute an anticipated defense.

3. SAME — *self-defense — reasonable fear — evidence admissible.* To justify the taking of human life in self-defense, it must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge. The circumstances calculated to excite fear will include not only the fact that the deceased attacked the defendant, but also the relative size and strength of the deceased as compared with that of the defendant.

4. Where three are being tried for murder, and evidence of remarks made by two of the defendants in the difficulty, or matters leading up to the homicide, are properly admitted against them, the court, on discharging such two defendants, may, by instruction to the jury, take away any injurious effect such evidence could have on the minds of the jury.

5. SAME—*burden of proof in self-defense.* An instruction, on a trial for murder, that the burden of proving that the defendant was not acting in self-defense when he stabbed the deceased was upon the prosecution, was held erroneous, in not embodying the qualification specified

in the statute, which provides that the burden of proving circumstances that justify or excuse the homicide devolve upon the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter, etc.

6. SAME—*proof of admissions before coroner's jury and preliminary examinations.* Parol evidence is admissible to prove what one accused of crime voluntarily disclosed before the coroner's jury, if it is shown that his examination there was not reduced to writing.

7. Under a statute like ours removing the disqualification of parties charged with crime, when a prisoner may testify in his own behalf if he desires, his testimony taken under oath at the preliminary examination, if it appears to have been fully given, without compulsion or promise, is admissible as a confession.

8. It has been held that if a party testifying before a coroner or committing magistrate is actually under arrest, though without a warrant, his testimony is inadmissible. But this rule applies when the accused is put on his oath, and examined, not on his own motion, but on that of the prosecution. Statements made under such circumstances may not only be not reliable, but are inquisitorial in their character.

9. Extra-judicial confessions, when free and voluntary, are of the highest order of evidence. The confessions of a party, written out by a police officer while holding him under arrest, and signed by the person accused, and admitted afterward to be correct in his examination before the coroner's inquest, and corroborated by his testimony on the trial, are admissible in evidence against him.

10. Where a man arrested by an officer without a warrant, upon suspicion of having committed murder, is compelled to answer under oath as a witness at a coroner's inquest, statements which he thus makes are not admissible against him on his trial for the murder.

11. Where one charged with murder testifies voluntarily before the coroner's jury, his statements made while so testifying, though under arrest, are admissible in evidence against him.

12. INSTRUCTIONS *in criminal cases—as to inferences from rulings of the court.* In a criminal case the defendant asked the court to instruct the jury that "any ruling which the court may have made during the trial should not be considered by them as any indication that the court has any opinion as to what the verdict of the jury ought to be :" *Held,* properly refused, as the purpose of instructions is to present the law to the jury, and not to inform them of what inference they may or may not draw from the rulings of the court.

13. SAME—*as to reasonable doubt.* On a trial upon a charge of murder the court instructed the jury, that if, from all the evidence, including defendant's, they entertained any reasonable doubt of defendant's guilt, they must find him not guilty: *Held,* that reasonable doubt of

his guilt included reasonable doubt as to whether he was under a reasonable apprehension, when he stabbed the deceased, that the latter was about to kill him or inflict great bodily harm upon him.

14. An instruction is erroneous which limits a reasonable doubt in a criminal case to one element of the proof, instead of requiring it to arise out of all the evidence in the case.

15. SAME—*refusing when embraced in others given.* There is no error in refusing a proper instruction when it is embraced in other instructions given.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. A. N. WATERMAN, Judge, presiding.

Messrs. DONAHOE & DAVID, for the plaintiff in error:

It was error to admit evidence of a similar assault by the defendant on Mrs. Hinze, with a knife, or the one on Hultberg. *Farris* v. *People,* 129 Ill. 521; Wharton on Crim. Ev. sec. 29; 1 Greenleaf on Evidence, sec. 52; *Shaffner* v. *Commonwealth,* 72 Pa. St. 65; *Payne's case,* 31 Gratt. 855; *Coble* v. *State,* 31 Ohio St. 100; *Whilden* v. *State,* 25 Ga. 396; *People* v. *Gibbs,* 93 N. Y. 471; *Coleman* v. *People,* 58 id. 555; *Carden* v. *State,* 84 Ala. 417; *Bemey* v. *State,* 69 id. 233; *Scharer* v. *State,* 36 Wis. 430; *Lebkowitz* v. *State,* 113 Ind. 26; *Watts* v. *State,* 5 W. Va. 532; *State* v. *Renton,* 15 N. H. 169; *People* v. *Bowen,* 49 Cal. 654; *State* v. *Shuford,* 69 N. C. 486; *State* v. *Wisdam,* 8 Port. 511; *People* v. *Corbin,* 56 N. Y. 363; *Snyder* v. *Commonwealth,* 85 Pa. St. 519; *Rosenzweig* v. *People,* 63 Barb. 635; *Bonsall* v. *State,* 35 Ind. 460; *People* v. *Barnes,* 48 Cal. 551; *Commonwealth* v. *Jackson,* 132 Mass. 16; *Gifford* v. *People,* 87 Ill. 211; *Baker* v. *People,* 105 id. 452; *People* v. *Sharp,* 107 N. Y. 427; *Cowan* v. *State,* 22 Neb. 524; *People* v. *Jacks,* 76 Mich. 218; *Kribs* v. *People,* 82 Ill. 425.

The declaration of Nichols, in the absence of Lyons, could not be used against the latter until a *prima facie* case of conspiracy had been established. Wharton on Crim. Ev. (8th ed.) sec. 698; *Spies* v. *People,* 122 Ill. 237; *State* v. *George,* 7 Ind. 321; *State* v. *Perry,* 16 La. 444; Roscoe on Crim. Ev. (17th Am. ed.) sec. 417.

In a capital case, if error intervenes, it must be assumed to be injurious to the prisoner, and ground for reversal. *People v. Williams,* 18 Cal. 187; *Scharer v. People,* 36 Wis. 430; *Preston v. State,* 4 Texas App. 201; *Rosenzweig v. People,* 63 Barb. 640; *Draper v. State,* 22 Texas App. 404; *Coleman v. People,* 58 N. Y. 555; *Commonwealth v. Bosworth,* 22 Pick. 400; *People v. Dibble,* 5 Park. Cr. 28; *Williams v. State,* 11 Texas App. 274; *Newton v. State,* 21 Fla. 53; *Hobery v. State,* 3 Minn. 262; *State v. Mikle,* 81 N. C. 552; *Devine v. People,* 100 Ill. 290.

The court erred in admitting in evidence the confessions of the defendant and his sworn statements before the coroner. *People v. McMahon,* 15 N. Y. 384; *People v. Mondon,* 103 id. 211; *Hendrickson's case,* 10 id. 13; *Teachout's case,* 41 id. 9; *Farkas v. State,* 60 Miss. 847; *Josephine v. State,* 39 id. 613; *Jackson v. State,* 56 id. 311; *Kelly v. State,* 72 Ala. 246.

The defendant's fifth instruction should have been given. It told the jury, if they believed, from the evidence, that Peterson attacked Lyons with violence, and that Lyons honestly believed Peterson intended to take his life or inflict great bodily harm on him, then Lyons was not obliged to retreat before he stabbed Peterson. *Lawler v. People,* 74 Ill. 229; *Leigh v. People,* 113 id. 381.

The burden of proof was on the prosecutor. Crim. Code, sec. 203; *Hopps v. People,* 31 Ill. 385; *South v. People,* 98 id. 261; *People v. Coughlin,* 65 Mich. 704; *Ogletree v. State,* 28 Ala. 702; *Maher v. People,* 10 Mich. 212; *State v. Donahoe,* 78 Iowa, 486; *Tweedy v. State,* 5 id. 433; *State v. Murphy,* 33 id. 131; *Commonwealth v. McKee,* 1 Gray, 62; *Commonwealth v. Rogers,* 7 Metc. 501; *Turner v. Commonwealth,* 86 Pa. St. 54; *State v. Flye,* 26 Me. 312; *Black v. State,* 1 Texas App. 369; *United States v. Wright,* 16 Fed. Rep. 112; *People v. Hill,* 49 Hun, 432; *O'Connell v. People,* 87 N. Y. 377; *People v. Marshall,* 59 Cal. 386.

It was error to refuse defendant's fifth instruction, showing what might constitute fear of life, etc. 2 Wharton on Crim. Law, sec. 486 a; 1 Bishop on Crim. Law, sec. 850; *Runyon* v. *State*, 57 Ind. 80; *Pond* v. *People*, 8 Mich. 150; *State* v. *Thompson*, 8 Iowa, 188; *Gallagher* v. *State*, 8 Minn. 270; *State* v. *Benham*, 23 Iowa, 154.

In *Commonwealth* v. *Riley*, Horr. & Th. 162, Thatcher, J., charged the jury, that in considering the question of self-defense they had a right to consider the relative size and strength of the parties, and their disposition and character, as they were proved on the trial. See, also, *Commonwealth* v. *Selfridge*, Horr. & Th. 23; Wharton on Homicide, sec. 207; *Cahn* v. *State*, 11 Crim. L. Mag. 658.

Mr. George Hunt, Attorney General, for the People:

The proof of the commission of one offense will not justify or tend to support a conviction for another offense, nor is such evidence admissible. But the rule does not exclude evidence proper and necessary to prove the offense charged. If competent evidence tending to prove the offense includes within itself evidence of the commission of another crime, it will not for that reason be excluded.

Evidence of the cutting of Mrs. Hinze was not introduced as an independent fact, or as a circumstance tending directly to prove the accused guilty of the murder of Peterson. *Farris* v. *People*, 129 Ill. 521.

Where two are tried together, evidence competent against either is admissible, although not competent against the other if tried alone. *Smith* v. *People*, 115 Ill. 20.

Where one accused of crime makes a voluntary confession that he committed the offense, and details facts and circumstances, such confession is admissible in evidence against him, although he was in custody when made. *Anderson* v. *State*, 25 Neb. 550.

A confession of one charged with murder, freely and voluntarily given, without inducements or threats, is admissible. *People* v. *Goldenson*, 78 Cal. 178.

To render a confession evidence the court must, if requested by the defendant, determine, outside of the hearing of the jury, whether it was made voluntarily. *Ellis* v. *State*, 65 Miss. 44.

As to the admissibility of confessions and statements in evidence, see *Dodson* v. *State*, 86 Ala. 60; *State* v. *Anderson*, 96 Mo. 241; *Steel* v. *State*, 83 Ala. 20; *Bibb* v. *State*, id. 84; *Banks* v. *State*, 84 id. 430; 1 Greenleaf on Evidence, sec. 220 a; *State* v. *Glahn*, 97 Mo. 679.

There being evidence of a conspiracy or common purpose, the declarations of those in the crowd are admissible in evidence against all. *Goins* v. *State*, 46 Ohio St. 457; *People* v. *Bently*, 74 Cal. 407; 3 Greenleaf on Evidence, sec. 693; *State* v. *Banks*, 40 La. Ann. 736; Wharton on Crim. Ev. secs. 698-701; *United States* v. *Goodwin*, 12 Whart. 469; *State* v. *Adams*, 40 La. Ann. 213.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

The plaintiff in error was indicted, with John Nichols and Edward Prendergast, for the murder of Pere Peterson on July 4, 1889. The three defendants were placed upon trial, but at the close of the evidence for the People, Nichols and Prendergast were discharged upon a motion made by their counsel to take the case as to them from the consideration of the jury. The trial then proceeded, and the jury found the plaintiff in error guilty and fixed his punishment at imprisonment in the penitentiary for life.

Three Swedes named Gust Johnson, Fritz Lundling and Pere Peterson, the deceased, spent the most of the evening of July 3, 1889, in the room occupied by Johnson in a building known as No. 148 East Chicago Avenue, situated on the south side of that street between Market Street on the west and

Franklin Street on the east in the north division of the city of Chicago. About one o'clock on the morning of July 4, 1889, they came down from this room to the sidewalk with a view of going across to the north side of the street to Peterson's room, which was in a building known as No. 145 East Chicago Avenue. When they reached the sidewalk upon the south side of Chicago Avenue in front of No. 148, they found a crowd of ten or twelve men, who made hostile demonstrations towards them, either because they were Swedes, or because of the previous difficulty hereinafter mentioned. They started to run away from this crowd to the north side of the street, Lundling first, Johnson next and Peterson last. Lundling and Johnson reached No. 145 and had gone half way up the stairs when they discovered that Peterson was not with them, and went back to look for him. They found him upon the edge of the sidewalk on the north side of the street. He had been cut in the neck with a knife, and was bleeding profusely, the carotid artery having been severed. He lay down and died in a few moments. The fatal wound was inflicted by the plaintiff in error. That the latter killed the deceased is not disputed by his counsel.

Johnson swears: "When we got on the sidewalk a big crowd was there, and when we got in the middle of the street somebody hollered after us. * * * I don't know what they said. * * * Then Peterson said, "What is that?" and one of the gang said 'Give it to the son of a bitch of Swede," and they were all jumping after us. Then we run." Lundling swears: "We came down * * * and we met a gang, and they said something to us, and Peterson said 'What?' and turned around. I said, 'Come along, there's too many for us,' and we started to run." Prendergast, Nichols and plaintiff in error were in the 'gang' or crowd here referred to. After Peterson was cut, the 'gang' or some four or five of them, including Nichols and plaintiff in error, ran eastward to Franklin Street and southward on Franklin Street. As plaintiff in

error ran by a vacant lot at the south west corner of Franklin Street and Chicago Avenue, he threw into it the knife with which he had killed Peterson, and the knife was found there by a policeman.

The defendant, Lyons, testified in his own behalf at the trial, and made the following statement: "I saw some one there and saw Prendergast make a punch at a man, and I heard some one holler "jiggers." I was then on the south side of Chicago Avenue. After I heard some one holler "jiggers," I started to run, and some one got hold of me around my neck, and was squeezing my neck. I put my hand in my pocket, and pulled out a knife, and I cut him. That is the knife that you show me. The person who grabbed me was a large man whom I never had seen before to my knowledge. After I stabbed him, I turned around and ran." No other witness except the defendant himself testified, that the deceased took hold of him around his neck, nor did the defendant himself mention any such circumstance until he gave his evidence upon the trial. He did not refer to it in his previous statements made to the police officers, or before the coroner's jury.

Plaintiff in error complains, that the trial court erred in admitting evidence of certain occurrences which took place a short time before the killing of the deceased. It is claimed that the State was thereby permitted to prove a distinct substantive offense having no connection with the crime charged against the prisoner. In order to understand this objection, it will be necessary to examine further into the facts.

On the evening in question, a man named Hinze, who lived with his family in an apartment over a clothing store at No. 156 East Chicago Avenue, a few doors east of No. 148 above named, had built a bonfire in the street in front of No. 156 in honor of the approaching day, and had some fireworks there. His wife and sister-in-law and some other members of his household were with him. While they were thus gathered around the bonfire, a crowd of from six to ten young men came

39—137 ILL.

up, among whom were Nichols and Lyons. There is some
evidence tending to show that Prendergast was with them,
but this is not clearly shown. A quarrel occurred between
Hinze and Lyons, on account of the swearing of the latter.
Mrs. Hinze and Nichols participated in this quarrel. Nichols
kicked Mrs. Hinze, and she slapped him in the face. The
defendant, Lyons, also struck her on the arm. Before he did
so, Nichols had said to him: "Dig" or "Jab the son of a bitch
of a Swede." Hinze then pulled off his coat and started after
·the crowd. They ran west to Market Street. Mrs. Hinze
also went towards the west to find her husband. At the cor-
ner of Market Street the defendant, Lyons, met her, and again
struck her on the arm. Hinze, who had not noticed that his
wife was following him, also encountered the defendant at
Market Street. He says: "I caught up with Lyons at Mar-
ket Street. I shook him, and told him if he came around
there again, I would kick  *  *  *  him.  *  *  *  I then let
Lyons go." Upon turning to go back eastward to his home,
Hinze met his wife, and upon taking her arm discovered that
it was bleeding. Either at the bonfire, or afterwards when he
met her at Market Street, the defendant had cut her with his
·knife. The gash in her arm was so deep that a doctor was
able to insert his finger into it. Hinze and his wife, instead
of stopping at No. 156, went on eastward towards Clark Street
to see a doctor, and did not return to their home until after
the killing of Peterson had taken place.

The crowd, which had been with Nichols and Lyons, went
northward on Market Street to or towards Pearson Street, but
·returned in a short time to No. 156 Chicago Avenue, where
the quarrel had occurred. Walsh swears, that he met the
crowd or some of them on Market Street, and Nichols re-
·marked that they had had some trouble with the Swedes and
wanted to go back and get even with them. Prendergast,
·Nichols and others went back to Chicago Avenue and west-
·ward to the house No. 156. Miss Cragin, the sister of Mrs.

Hinze, a Swede named Hultberg, and his roommate, named Hohn, who all lived with Hinze, were in the doorway of No. 156, when these men came up. There were five or six of them. They stopped three doors west of No. 156, and would come forward and go back. Finally Prendergast came up and seized Hultberg by the arm and tried to strike him, saying "You are the damned son of a bitch that was fighting here a few minutes ago." When Hultberg told him he was mistaken, some one in the crowd said, "Leave him go," "This ain't he," and another said, "No, but dig into him anyhow." Miss Cragin and Hultberg thereupon ran up stairs into the house, but Hohn lingered upon the steps, and returned to the street. The crowd then went towards Market Street, and in front of No. 148, a few doors westward from No. 156, they encountered Lundling, Johnson and Peterson, and Prendergast was seen to strike at one of them.

Herny swears, that he saw the defendant Lyons at Market Street after the quarrel with Hinze and his wife, and heard him say that "he struck the woman; that he must have given it to the woman, as there was blood on his knife;" this witness also states that he then saw the knife in the defendant's hand. The Policeman, Moore, swears that he saw Lyons near one o'clock in the morning of July 4 about the corner of Market Street and Chicago Avenue, and, having been told by one Sweenie that he had insulted a woman at the bonfire, asked Lyons about it, and the latter answered, that "they pitched on to him, and  *  *  *  he couldn't help himself." Moore says, that he then told Lyons he would let him go if he would go home, and Lyons said that he would go home. Moore then went on to No. 156 and saw Prendergast and Nichols there, and ordered them to leave, and saw them go to the north side of the street towards Franklin Street. Moore further says that he stopped "a few minutes," and turned back, and saw the three Swedes running across the street.

Hohn swears that it was only about five minutes after Prendergast seized Hultberg by the arm, before he saw Peterson on the sidewalk on the north side of the street. The defendant swears, that he saw Prendergast when he struck at one of the Swedes, although it was quite dark at that time. He must therefore have been near to Prendergast and Nichols when the assault was made on Hultberg.

When the quarrel occurred between Hinze and his wife and Nichols and Lyons, it was after twelve o'clock. When Hinze and his wife started to the doctor's it was after half past twelve, and Peterson was killed not later than one o'clock. Some of the evidence—notably that of the officer Moore and of the defendant himself—tends to show that not more than fifteen minutes elapsed after Mrs. Hinze was stabbed before Peterson was killed.

The testimony, which is alleged to have been improperly received, is that which relates to the cutting of Mrs. Hinze by the defendant and to the assault by Prendergast upon Hultberg. It appears from the record, that proof of the wound inflicted upon Mrs. Hinze was offered "for the purpose of showing the character of the instrument with which this cut (of which the deceased died) was made," and that the court admitted it for that purpose only. But we think that the court committed no error in refusing to exclude this testimony, after Prendergast and Nichols were discharged, for another reason.

The theory of plaintiff in error is, that the cutting of Mrs. Hinze was one offense and the cutting of Peterson was another and different offense, and that, upon the trial of one crime, evidence of the commission of another crime is improper. It is undoubtedly the general rule, that proof of a distinct, substantive offense cannot be admitted in support of another offense. But the rule does not apply if it appears that the evidence of another offense tends, in some way, to prove the accused guilty of the crime for which he is on trial. It does not apply, where there appears to have been a connection between the two acts

in the mind of the actor linking them together for some purpose he intended to accomplish, or where there is such a logical connection between the two that the one tends to establish the other, (*Farris* v. *The People*, 129 Ill. 521,) or where the two acts form but one transaction. (Idem.) Such testimony is also sometimes admissible to show motive, or to refute an anticipated defense.

Applying these principles to the facts above detailed, it is apparent that the whole series of events from the quarrel at the bonfire to the death of Peterson constituted but one transaction. After the dispute with Hinze and his wife, resulting in a shaking of the defendant by Hinze, the defendant at once joined his confederates, and returned to avenge his real or imaginary injuries. Nichols said to the crowd a few moments after Hinze had left the defendant, "Come up in the avenue; we had a scrap with some Swedes, and we want to get even with them." While one witness testifies that he did not see the defendant when this remark was made, yet other evidence tends to show that he was there. He is shown to have been in the same part of the street where his companions were at that moment, and to have been in their midst after they returned to No. 156. He was one of the parties who with Nichols had had the 'scrap' referred to, and this remark merely characterized the act and purpose of returning to the scene of the conflict. The remark was a part of the *res gestæ*.

And so, in regard to the assault by Prendergast on Hultberg, the Swede. The defendant was just behind Prendergast at the time, and the remarks accompanying the assault show the purpose of the crowd to have a settlement of the previous quarrel. Such was the meaning of the charge against Hultberg that he had been fighting there a few moments before, and of the remark from some one that Hultberg was not the right man. Hinze, whom they were evidently looking for at this dark hour after midnight, had gone with his wife to the doctor, and of this they were ignorant. The evidence of these

previous occurrences showed the motive of the defendant in using his knife against Peterson, and tended to contradict his theory of self-defense. There was a logical connection between the difficulty the defendant had with Hinze and his wife, on the one hand, and the reappearance of the defendant at the scene of the difficulty a few moments afterwards on the other hand. Some other expressions were uttered to which objection is made, but they came from the crowd of which Lyons was a part, and, as they were all acting together, such expressions merely characterized the mission in which Lyons was then engaged.

The defendant could not have been injured in view of the fact that the court of its own motion gave the jury the following instruction:.

"The jury are instructed that the defendant is in this case on trial for an alleged killing by him of Pere Peterson, and for this alone. In this proceeding he is not on trial for any conduct by him except the alleged killing of Pere Peterson. The jury are therefore instructed, that in this proceeding they are to determine only whether the defendant is guilty of killing Pere Peterson, and if so, whether he is guilty of murder or manslaughter, or not guilty at all. Although the jury should believe, from the evidence, that the defendant is guilty of riot or disorderly conduct, or assault upon Mrs. Hinze, or that he cut her with a knife, still, unless the jury believe, from the evidence, that the defendant killed Pere Peterson, and in so doing was and is guilty of murder or manslaughter, then the jury must acquit the defendant."

It is assigned as error that the court allowed the prosecution to prove what the defendant said before the coroner's jury, when testifying there as a witness on July 5, 1874. The defendant was arrested at four o'clock on the morning of July 4, and it is said, that his evidence given before the coroner under oath while he was under arrest could not be introduced against him on the trial. The prosecution proved by

three police officers, that the defendant confessed to them that he stabbed the deceased. When he so confessed, he was not under oath nor before the coroner, and his confession was voluntary and not brought about by any compulsion. Extra judicial confessions when free and voluntary are of the highest order of evidence. (1 Greenl. on Ev. secs. 216 and 219; *Miller* v. *The People*, 39 Ill. 457; *Langdon* v. *The People*, 133 id. 382.) The confession thus made was written out by one of the police officers and signed by the defendant. When he went before the coroner's jury he stated, that he had already made a written confession before the Captain of the Police. The written statement thus previously made was introduced by the Captain of Police before the coroner's jury and identified by him, and there admitted to be true by the defendant. It was also introduced upon the trial below. In it the defendant says: "we were standing on Chicago Avenue between Franklin and Market; three Swedes came along; one of the fellows who were standing there hit one of them; the Swede made a run at me; I turned around and struck one of them; I had the knife in my hand and gave him a 'jab;' I don't know what he did; all the gang ran and I ran with them."

Substantially the only statement made by the defendant before the coroner's jury, besides saying that he had made a confession and that it was true, was that Nichols had said to the crowd "Draw your knives," and to him, while behind or at the side of Peterson, "give him a jab." After thus referring to his confession before the Police Captain and making the other statement here referred to, the defendant retired from the presence of the coroner's jury, but was recalled by them, and, upon returning, was asked by the jury "if he had been scared into his answers or confessions by the police officers. He said that he had not; that, if he had another chance, he would make the same confession." The main fact established by the confession as originally made and signed before the police officers, and as introduced and admitted before the cor-

oner's jury, was that he stabbed the deceased. This fact he admitted and confessed on the trial of the case, when testifying as a witness in his own behalf and under the advice and in the presence of his counsel. The case, therefore, is not one where the confession is introduced to overcome a denial of the fact of killing, or to support circumstantial evidence tending to show the killing of the deceased by the accused. The defendant admits all that the confession proves, and the subject matter of the confession is sustained by his own testimony on the trial. (*South* v. *People*, 98 Ill. 261).

But the proof shows that his statements before the coroner's jury were made voluntarily, and, therefore, we think that they were admissible for the reasons hereinafter stated. It has been held that, if a party testifying before a coroner or committing magistrate, is actually under arrest, though it may be without a warrant, his testimony is inadmissible. But this rule applies where the accused party is put on his oath and sworn and examined, not on his own motion, but on the motion of the prosecution. Statements made under such circumstances may not only be unreliable, but inquisitorial in their character. Where a man arrested by an officer without a warrant upon suspicion of having committed murder is compelled to answer under oath as a witness at a coroner's inquest, statements which he thus makes are not admissible against him on his trial for the murder. The thing prohibited by the rule is "the special interrogation of the accused—the converting him, whether willing or not into a witness against himself; assuming his guilt before proof, and subjecting him to an interrogation conducted on that hypothesis." (2 Best on Ev. sec. 557). But it is otherwise where the statements made are voluntary, and where the oath taken is voluntary. (Wharton's Crim. Ev.—9th ed.—secs. 668 and 669).

The defendant was not obliged to appear as a witness and take an oath before the coroner's jury, nor to answer any question that would criminate himself. His act in testifying

there was voluntary. Our statute provides that "no person shall be disqualified as a witness in any criminal case *or proceeding* by reason of his interest in the event of the same as a party or otherwise." (Crim. Code Rev. Stat. chap. 38—sec. 426; Starr & Cur. sec. 486, page 863). It has been held, that, under a statute like this where a prisoner may testify on his own behalf in all criminal proceedings if he desires, his testimony taken under oath at the prelimary examination, if it appears to have been freely given, without compulsion or promise, is admissible as a confession. (*People* v. *Kelly,* 47 Cal. 125; 1 Greenl. on Ev.—14th ed.—sec. 225 and note (a); Whart. Crim. Ev. sec. 669 supra). In the case at bar, the coroner's jury seem to have been so careful, that they recalled the defendant and cautioned him against the binding force of anything that he might have said if he had been "scared" into saying it, and re-examined him after having given this caution. There is no evidence that he was compelled to testify before the coroner, or that his appearance there was not his free and voluntary act.

Counsel for plaintiff in error make the further point, that, if the evidence of the defendant before the coroner could have been introduced against him on the trial, yet the court erred in allowing parol proof of such evidence to be given, when the coroner's written minutes of the statements there made should have been produced. It does not appear clear to us, that the coroner wrote down the testimony of the defendant, which he gave upon his first appearance before the jury, and before he was recalled and reexamined. It is clearly shown, that the written confession, previously made and signed before the police officers by the defendant, was presented to the jury and read by each member of it, and, as that confession was reaffirmed by the defendant in the presence of the jury, it seems to have been accepted as his written statement, and was afterwards introduced upon the trial. However this may be, we think that no error was committed in admitting parol evidence

in this case. It is well settled that parol evidence is admissible to prove what the accused voluntarily disclosed before the coroner's jury, if it is shown that his examination there was not reduced to writing. (1 Greenl. on Ev. sec. 227 ; *State* v. *Parish,* 35 N. C. (Busbee's Law) 239 ; *Rex* v. *Reed,* 1 Moody & Malkin, 403 ; *King* v. *Fearshire,* 1 Leach's Crown Law, 240.) It is established by the evidence of one of the jurymen and of the coroner himself, that the testimony of the defendant as given before the jury after he was recalled was not reduced to writing. The oral evidence is of what he stated after he was recalled, as well as of statements made upon the first examination. It was certainly admissible as to the statements made on the second examination, and the motion to exclude the oral testimony did not distinguish between the two examinations. In fact, substantially all that was said in the first examination was repeated in the second, and the latter was intended to be the main one, as it was given after the witness had received the caution already referred to.

It is further claimed that the court below erred in refusing to give certain instructions asked by the defendant. The first of these instructions is substantially the same as the second instruction quoted in *Lawler* v. *The People,* 74 Ill. 228, and the refusal of which was held to be erroneous. It was expressly stated there that the proposition embraced in the refused instruction was not embodied in any of the instructions that were given, but here it is embraced in the instructions given. The fifth instruction given for defendant told the jury, that, if the party assailed has reasonable ground to believe that he is in danger of losing his life or receiving great bodily harm, the right to defend himself from such apprehended danger may be exercised by him, and if the death of his assailant results from the reasonable defense of himself, he is excusable whether he intended that consequence or not. The seventh instruction given for the defendant told the jury, among other things, that, if from all the evidence including

that given by the defendant, they entertained any reasonable doubt of his guilt, they must find him not guilty. Reasonable doubt of his guilt included reasonable doubt as to whether he was under a reasonable apprehension, when he stabbed Peterson, that the latter was about to kill him, or inflict great bodily harm upon him.

The second refused instruction told the jury, that the burden of proving that the defendant was not acting in self-defense when he stabbed the deceased was upon the prosecution. The instruction was erroneous in not embodying the qualification specified in the statute, which provides that the burden of proving circumstances that justify or excuse the homicide will devolve on the accused "unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter, or that the accused was justified or excused in committing the homicide." (Crim. Code, sec. 155; *Alexander* v. *People*, 96 Ill. 96.) The ninth instruction given for the People was in the language of the statute, and correctly informed the jury when the burden of proof lay upon the accused. The second refused instruction is also erroneous in limiting "reasonable doubt" to one element of the proof instead of requiring it to arise out of all the evidence in the case.

The third refused instruction was properly refused, because it told the jury, among other things, that "any ruling which the court may have made during this trial should not be considered by you as any indication that the court has any opinion as to what the verdict of the jury ought to be." The object of instructions is to present the law to the jury, and not to inform them what inferences they may or may not draw from the rulings of the court.

The fifth and sixth refused instructions related to the subject of self-defense, and their refusal could have done the defendant no harm as the law in regard to self-defense was fully and fairly stated in the instructions given for the People

and for the defendant. The fifth instruction given for the defendant, a part of which has been referred to above, stated the doctrine very fairly for him in the following words:

"The court instructs you, that the law of self-defense gives the party assailed the right to repel force by force, and he need not believe that his safety requires him to kill his adversary, in order to give him the right to make use of force for that purpose. When his life is in danger, or he is in danger of great bodily harm, or when, from the acts of the assailant, he believes, and has reasonable ground to believe, that he is in danger of losing his life or receiving great bodily harm from his adversary, the right to defend himself from such danger or apprehended danger may be exercised by him, and he may use it to any extent which is reasonably necessary. He need not believe that he can only defend himself by taking the life of his assailant. If the death of his assailant results from the reasonable defense of himself, he is excusable, whether he intended that consequence or not, or whether he believed such result was necessary or not."

The sixth instruction, moreover, assumes that the circumstances therein referred to had been proven, when it was the province of the jury to find from the evidence whether such circumstances existed or not. The language of the fifth instruction given for the People embraced everything in the sixth refused instruction of the defendant which it was necessary for the jury to consider. A portion of that language is as follows: "It must appear that *the circumstances* were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears and not in a spirit of revenge," in order to justify the killing. The circumstances, which might be sufficient to excite fear, would include not only the fact that the deceased seized the defendant by the neck, if the jury found such to be the fact from the evidence, but also the relative size and strength of the deceased as compared with those of the defendant.

There was nothing in the eighth refused instruction which was not embraced in the instructions already given. The language of the instruction is obscure and misleading. The jury are not told, that, if they have a reasonable doubt as to whether the defendant is guilty of murder or manslaughter, they cannot find him guilty of either offense. The instruction is so worded as to make the doubt apply to either offense, while the finding is required to be as to one only. A jury might be in doubt as to whether the accused was guilty of murder or not, but at the same time might believe that he was guilty of manslaughter. The tendency of the instruction was to limit the finding of the jury as to the defendant's guilt or innocence of the crime of murder, and to foreclose any finding as to his guilt or innocence of the crime of manslaughter.

After a patient and careful examination of the whole record, we think that the plaintiff in error had a fair trial, and that there is no error which will justify us in reversing the judgment.

*Judgment affirmed.*