THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RICHARD A. TROCK, Defendant-Appellant.

First District (1st Division)    No. 62352

Opinion filed January 17, 1977.

James Geis and Martin Carlson, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Joan S. Cherry, and Jeffrey Singer, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Richard A. Trock, was charged in a two-count indictment with the murder of his wife Violet in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 9—1). After a bench trial, he was found guilty and sentenced to the Illinois State Penitentiary for 25 to 35 years. Defendant appeals, contending that the State failed to prove beyond a reasonable doubt that defendant intentionally shot his wife.

Darol Snow, an automobile salesman at a Pontiac dealership in South Holland, Illinois, testified that defendant spoke to him on March 12, 1973, about the purchase of a new Grand Prix automobile, and on March 13, 1973, the defendant told him he would bring his wife to the dealership to look at the automobile. At approximately 7:30 p.m. on March 14, 1973, the defendant and his wife came in to discuss the purchase of the Grand Prix. After 20 minutes of discussion, the defendant's wife stated that she did not like the price of the Grand Prix and that the car they had was fine. A trade-in of the car they owned had been mentioned, but the Trocks owed so

much money on that car they would receive very little credit against the purchase price. Defendant was insistent upon buying the Grand Prix. A fairly loud conversation between defendant and his wife ensued without changing the positions of defendant and his wife.

Linda Cservenyak testified that on March 14, 1973, she lived at 17726 Arcadia, Lansing, Illinois. Her apartment was directly below that of the Trocks. On March 14, 1973, she went to bed at about 10:30 p.m. and was awakened at 10:50 p.m. by a loud, rumbling sound which came from the Trock apartment. She heard loud footsteps in the Trock apartment after the rumbling sound.

David English, a Lansing police officer, testified that on March 14, 1973, at 11:15 p.m., he was in the communications room when the dispatcher received a telephone call. The dispatcher said the caller was a Mr. Trock at 17726 Arcadia, who said he had shot his wife. Approximately two minutes later, English and two other officers were outside the 17726 Arcadia building. The officers pressed the button for the Trock apartment and the inside door was opened. While they were ascending the stairs, they heard a male voice yelling, "Up here, up here, I killed my wife." When they arrived at the Trock apartment, they saw the defendant standing in the doorway with a large amount of blood on him. Defendant walked through the living room saying, "I did it. I did it. I shot my wife."

When English entered the apartment, he saw a woman, covered with blood, sitting on the couch in the living room, with her head resting on the back of the couch. The woman had a large hole in the center of her forehead. She had no pulse. He went to the telephone in the dining area to place a call and saw that the telephone was smeared with blood.

English asked defendant what had happened. Defendant said he was sitting in a chair, cleaning a gun and it discharged. The defendant indicated that he was sitting in the chair near the end of the couch where the victim was seated.

Robert Turbin, a detective lieutenant of the Lansing Police Department, testified that when he arrived at the Trock apartment he saw defendant sitting in the dining area. Defendant was saying, "Oh my God, oh my God, I shot her; that makes me a murderer."

Turbin examined the apartment. He found a .45-caliber Colt single-action revolver on a piece of paper toweling on the end table in front of the victim. On another table were three other guns, one of which was in a closed pouch. The only loaded weapon was the Colt, which had six shells in it, including one expended shell. There was blood on the wall and on the end table to the left of the victim. There was a spot of blood on a guncase in front of the victim.

On a shelf in a bedroom closet, Turbin found a motor vehicle title with blood on it and four cigar boxes containing live and expended shells for

the Colt revolver. There was a patch of blood on the carpeting below the shelf. The motor vehicle title was the title to the Pontiac convertible which the victim and defendant owned. Defendant told Turbin that the blood and the title were in the bedroom because he put them there.

Defendant was given the *Miranda* warnings by Turbin at the Lansing Police Department. Defendant then made a statement, telling Turbin, "I wasn't cleaning my weapon. I was showing my wife how to load and unload the weapon. I had just previously purchased this weapon a short time before and she wasn't familiar with it." Defendant stated he was sitting in the chair to the left of the victim, who was on the couch. Turbin measured the distance between that chair and the victim; it was eight feet. Turbin testified about the operation of the Colt revolver. He stated there were three hammer positions on the weapon. The first position is safety, the second is loading and unloading, and the third is firing. The third position can only be arrived at manually. The revolver would discharge if, while turning the cylinder, the hammer is let down.

The parties stipulated that Pasqual Culala, a licensed medical doctor specializing in forensic pathology, examined the body of Violet Trock internally and externally on March 15, 1973, and found a stellate-shaped bullet wound in the forehead and fragmented skull bones. It was his opinion that she died as a result of the bullet wound to the head and brain. Culala removed the bullet from her head.

The parties stipulated that Burt Nielson, a qualified ballistics expert employed by the Chicago Police Department Crime Laboratory, compared bullets fired from the Colt revolver with the bullet removed from Violet Trock's head and that in his opinion the latter was fired from the defendant's Colt revolver.

It was also stipulated that Mary Ann Mohan, a qualified microanalyst employed by the Chicago Police Department Crime Laboratory, conducted serological tests on a patch of gold rug taken from the bedroom of the Trock apartment and on the motor vehicle title found on the closet shelf and that they both contained human blood Type A, Violet Trock's blood type.

The parties further stipulated that technicians employed by the Federal Bureau of Investigation Crime Laboratory would testify that a sealed piece of Violet Trock's skull bone was sent to them by Dr. Kornblum, of Ventura, California, and was tested at the laboratory. As a result of chemical testing, it was determined that the black material on the bone consisted essentially of lead, but also present were lesser amounts of copper, zinc, barium, antimony and iron. The technicians concluded these residues are characteristic of residues which contaminate the edges of bullet holes. However, from the analysis of this particular specimen it

was not possible to determine the distance between the piece of bone and the firearm at the time of firing.

The parties stipulated that Mr. Holland, an employee of the Federal Bureau of Investigation Crime Laboratory, would testify that only a piece of skull bone was received by him and that it was subjected to an X-ray fluorescence test.

Dr. Ronald Kornblum, the chief medical examiner for Ventura County, California, testified on behalf of the prosecution. He was a licensed physician, whose specialty was forensic pathology, which he had practiced for approximately 8½ years. During that period he had performed more than 5,000 autopsies, 500 of which involved bullet wounds. He testified that there were three categories of gunshots based upon the distance from the firearm to the target: contact, close-range and distance shots. A contact wound is one in which the muzzle of the gun is in physical contact with the body. In close-range, the muzzle is so close to the body that deposits from the discharge are found on the surface of the skin. Distance wounds are caused by all shots beyond those which leave discharge deposits on the skin.

Dr. Kornblum explained the criteria he used to determine the type of shot used. A contact shot is indicated by (1) a burn caused by the heated barrel of the gun being in contact with the skin, (2) a stellate or star-shaped wound caused by the entering of gases between layers of tissue expanding and tearing the tissue away from the bone, and (3) a deposit of soot and powder on the interior of the wound and on the bone caused by the residue of the bullet passing through the layers of tissue. Deposits of soot and powder on the surface of the skin around the wound indicate a close-range shot. Distance shots are evidenced by a small hole caused by the bullet and by the absence of powder and soot deposits in the area of the wound.

He further testified that he had examined the body of the victim by conducting an autopsy on the exhumed body and had viewed many photographs of the body and of the scene at the Trock apartment. He conducted a nitrate test on the portion of bone removed from the area of the wound. He also caused the Federal Bureau of Investigation Crime Laboratory to conduct a chemical analysis of the piece of bone.

As a result of his autopsy, he made several observations about the death of the victim. The base of the skull revealed a wound track from the left forehead to the posterior of the skull. He concluded that the bullet wound was the cause of death. It was his opinion that the trajectory or path of the bullet was a slight angle left to right and a slight downward angle. There was a hole in the forehead filled with a wax-like substance and covered with cosmetics. Surrounding the hole on the outer surface of the skull was

a greenish-black substance. This substance was chemically tested by him and by the F.B.I. Crime Laboratory and, as a result thereof, the doctor concluded that this substance was the residue of a gunshot. It was his opinion that the type of gunshot that caused the victim's death was a contact shot. He explained that the presence of the stellate wound and the residue on the skull bone were indicators of that type of shot. The doctor did not believe that it was a close-range shot because close-range shots cause stellate wounds only under unusual circumstances and because there were no powder deposits on the skin around the wound. He also stated that it was his medical opinion that at the time of the shot Violet Trock was sitting at the end of the couch leaning to her left. The fatal shot would have caused the body to go limp. Her head, therefore, could not have been resting on the back of the couch when she was shot.

On cross-examination, Dr. Kornblum testified that on October 16, 1974, he rendered a written report to the State's Attorney indicating that the fatal shot was a close-range shot and that in a letter to the Federal Bureau of Investigation Crime Laboratory he had stated the fatal shot was either a contact or a close-range shot.

He further testified that he did not find a muzzle burn on the victim's forehead and that a bullet itself may carry residue from the barrel of the gun. He also stated that in order to determine the exact distance between a firearm and target, the gun must be test-fired at the same kind of object that was the target in the situation being analyzed. Neutron activation analysis can be used to determine the distance from gun to object. He had sent the material to the Federal Bureau of Investigation Crime Laboratory for neutron activation analysis.

It was stipulated that Dr. V. S. Vasan, a qualified chemist and spectroscopist employed by the Chicago Police Department Crime Laboratory, would testify that a neutron activation analysis would have no scientific purpose after the wound was contaminated by washings and cosmetics.

Richard Trock, the defendant, testified in his own behalf. He stated that on March 14, 1973, he lived with the victim, his wife, at 17726 Arcadia, Lansing, Illinois. At about 11 p.m. on that date, the defendant and the victim were watching television. Defendant took his guns out to clean their exterior surfaces with a silicone cloth. After he had cleaned his guns, defendant decided to show the victim how to load his .45-caliber Colt revolver.

Defendant went to the bedroom closet in order to get shells with which to load the gun. He proceeded to put six live cartridges into the cylinder, thereby fully loading the revolver. While handing the gun to the victim, the gun discharged. Immediately defendant went to the victim; then

immediately called the police. Defendant denied intentionally and knowingly shooting his wife.

On cross-examination, defendant stated that he was unemployed at the time of the occurrence. He testified that both he and the victim were interested in the Grand Prix automobile. After returning from the automobile dealership, defendant and his wife discussed the purchase of the Grand Prix. During the discussion, the title to their car was in the living room, ·where they were seated. The victim gave defendant permission to sign both of their names to the title. The title remained in the living room until defendant called the police; after calling them, he put the title on the shelf in the bedroom closet where Detective Turbin found it. Defendant did not know why he had removed it from the living room.

He further testified that he wanted to show the victim how to load the Colt .45-caliber revolver. He had used the weapon previously and knew how it worked. Six live cartridges were in the revolver when defendant handed it to his wife. He used six cartridges to show her how the gun was loaded. During subsequent questioning, defendant said he used six shells so that the victim would know how fully to load the revolver, although he acknowledged one shell would have been enough to demonstrate the procedure. He used live shells because expended shells might not fit in the chambers of the revolver. He did not try to use expended shells, although they were stored on the same shelf as the live ammunition.

When questioned about the operation of the Colt .45 revolver, defendant said that there were three hammer positions, safety, half-cocked and cocked. It is impossible to load or fire the weapon when the hammer is on safety. Although the normal firing position is the cocked position, it is unnecessary for the hammer to be in the third position to fire the revolver. When the hammer is in the half-cocked position and is then pulled back toward the cocked position, the gun will fire if a finger is put on the trigger and the hammer is released. The gun can be loaded only when the hammer is in the half-cocked position.

When the gun is discharged, the firing pin strikes the shell casing and makes an indentation on it. The indentations are made on different places of the shell casing by the two methods of firing.

Defendant remembered he originally told the police the revolver discharged while he was cleaning it and later told Detective Turbin the gun went off while he was showing the victim how to load it. He was only one inch taller than the victim. Defendant could not state how the bullet struck the victim at a downward angle through the forehead although they were both seated at the time of the shooting.

■■ ■ Defendant contends that the State failed to prove beyond a

reasonable doubt that he knowingly and intentionally shot his wife. He argues that the testimony of Dr. Kornblum is incredible because prior to the trial Dr. Kornblum said the bullet wound was caused by a close-range or a contact shot. At trial Kornblum testified that the wound resulted from a contact shot. His conclusion was based on the presence of a stellate wound and a deposit of soot and powder from the bullet on the surface of the skull in the interior of the wound. He determined that the wound was not caused by a close-range shot because there were no powder deposits on the surface of the skin and because stellate wounds are caused by close-range shots only under unusual circumstances. His analysis is supported by Dr. Culala's observation of the stellate wound and by the Federal Bureau of Investigation Crime Laboratory report that elements which commonly contaminate the edges of bullet holes were found on the skull bone.

Other evidence was adduced by the State. The victim was shot in the middle of the forehead. In Dr. Kornblum's opinion, the bullet entered the victim's forehead at a downward angle while she was reclining on the couch. The victim and defendant had argued about the purchase of a new automobile on the night of the shooting. Linda Cservenyak heard a loud, rumbling noise at 10:50 p.m. The police were called twenty-five minutes later, at 11:15 p.m. It was Dr. Kornblum's theory that the victim's body was moved after the shooting. The victim's blood spotted the motor vehicle title which was removed from the living room.

Defendant also contends that intent was not proved beyond a reasonable doubt because he denied he knowingly or intentionally killed his wife.

The credibility of the witnesses is determined by the trial judge in a bench trial and this court will not reverse unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of guilt. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) The trier of fact is not bound to believe defendant's exculpatory statement. (*People v. Warren* (1965), 33 Ill. 2d 168, 210 N.E.2d 507.) The evidence here was sufficient for the trial court to find that defendant knowingly or intentionally killed his wife. On the record here, we do not find that the trial court's determination was erroneous. Defendant was proved guilty beyond a reasonable doubt.

Judgment affirmed.

GOLDBERG, P. J., and SIMON, J., concur.