The People of the State of Illinois, Plaintiff-Appellee, *v.* Charles Tidwell, Defendant-Appellant.

(No. 53997;

First District—January 8, 1971.

Gerald W. Getty, Public Defender, of Chicago, (Mary Cahill and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert Novelle, and Themis Karnezis, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

*OFFENSES CHARGED*

Unlawful possession and sale of narcotics. Ill. Rev. Stat. 1967, ch. 38, par. 22—3.

*JUDGMENT*

After a bench trial, defendant, who was a guard at the county jail, was found guilty and given concurrent sentences of 10 to 11 years (sale) and 2 to 3 years (possession).

*CONTENTION RAISED ON APPEAL*

The trial court erred in receiving into evidence a five-dollar bill taken from defendant's locker at the jail.

*EVIDENCE*

Because of the conclusion we reach in this opinion, we find it necessary to set forth the testimony in detail.

*Walter Scott,* for the State:

He was an inmate of the Cook County jail awaiting trial on a burglary charge. During the second week of December, 1967, he told Patrick Tuite, Chief of the Criminal Division of the State's Attorney's Office, that he thought he could buy marijuana from defendant who was a jail guard.

On December 20, 1967, he was introduced to Leotis Clark. On December 21, 1967, he met Clark in the visitor's cage at the jail, and then Clark talked to defendant. After that, Scott asked defendant if he would pick up some money his cousin had brought. Defendant agreed to get it for him and leave it folded up in the visitor's pass. In the visitor's cage, Clark gave defendant $25 wrapped in his visitor's pass, and defendant then passed the money through the bars to Scott. The money was in small denominations, including a five-dollar bill. About fifteen minutes later, Scott gave defendant five dollars for making the transfer of money and $18 for defendant's promise to get him some marijuana, with the understanding that defendant would be given another $2 upon delivery.

The following day, he talked to defendant who explained that, due to a shakedown at the jail that day, he did not have the marijuana, but would bring it the next day. Shortly after this conversation, he talked with John Clarke [a Probation Officer who was investigating the jail and who had been notified of the proposed purchase of narcotics], and gave him a note explaining that the exchange was to take place the next day. The next day he saw defendant who told him that he would have to wait until later to get the marijuana. Scott notified Clarke of the additional delay.

On the morning of December 24, defendant told Scott that the marijuana was available and he would be back with it. Scott then held up

two folded single dollar bills so that Clarke, who was within sight, would know that the exchange was about to take place. Defendant returned shortly and told him to come to the safety cage. Defendant knelt down and handed him a tier board under which were two tin-foil packets. He gave defendant the two folded one-dollar bills which defendant placed in his pocket. About one minute later, after defendant left, Clarke came over and Scott told him that the packets had been passed. He gave Clarke one of them and placed the other packet in a cigarette package because of the presence of another guard.

Five minutes later, Lieutenant Gilbert removed Scott from the tier and he gave the cigarette package with the tin-foil packet to Gilbert. He was then taken to the bull pen where he gave Tuite a sheet of paper on which he had written the serial numbers of the bills.

As a result of his participation in the purchase, his pending burglary charge was *nolle prossed.*

*Leotis Clark,* for the State:

In December of 1967, Tuite asked him to help the State's Attorney's Office in this matter. On December 20, 1967, he was introduced to Walter Scott. The next day he was given four five-dollar bills and five one-dollar bills, a total of $25, the serial numbers of which had been recorded on a paper which he signed. That afternoon he went to the jail to see Scott, telling the guards that he was his cousin. Scott told him to call defendant. Defendant and Scott walked around in back and were talking, after which defendant came back and Clark gave defendant the $25 wrapped in a visitor's pass. Scott and defendant left for a moment, and then Scott returned, showing him that he had the money.

The State's Attorney's Office gave him some money for clothes.

*John J. Clarke,* for the State:

He is a Probation Officer and was on a special assignment investigating conditions at the county jail during December of 1967. He first met Scott in Tuite's office around December 21, 1967, and talked with him several times at the jail in the next few days.

On the morning of the 24th, he saw defendant arriving for work. He and defendant were searched before going into the jail. Inside the jail, he went to the area of Scott's tier, where he saw Scott hold up two one-dollar bills folded to the size of a quarter. He then walked over to an inmate, Alderman Schababy, stood with his back toward Scott, and told Schababy to tell him when he saw a guard approach Scott's tier. He was at that time about 40 feet from the safety cage.

When Schababy notified him, he turned and saw defendant kneel in front of the safety cage where Scott was, and push a slate board under the bars. As this occurred, he glimpsed a shiny silver substance in de-

fendant's hand. Defendant then stood up, put his left hand into his left pants' pocket, and walked away. Clarke then walked over to Scott who gave him a tin-foil packet in which he observed a crushed green plant that he believed to be marijuana. He summoned Officers Carlyle and Wallenda and arrested defendant. They immediately searched defendant and in his jacket pocket found seven tin-foil packets, each containing a crushed green plant which also appeared to be marijuana. Two one-dollar bills folded to about the size of a quarter were taken from defendant's left pant's pocket.

Tuite and Officers Montejano and Moriarity arrived with an infra-red lamp. The two one-dollar bills recovered from defendant, along with a five-dollar bill later taken from his wallet in his locker, showed a stamp which read "State's Attorney's Office" when placed under the infra-red lamp. The administrative officials of the jail have complete control of the locker room facilities, which are subject to search at any time, even though the guard has his own key.

*Jack Wallenda,* for the State:

He is a Chicago detective on duty with the State's Attorney's Office. During December, 1967, he was assigned to an investigation of the Cook County jail. He was present when the $25 was given to Leotis Clark. He dusted the bills, four five-dollar bills and five singles, with fluorescent powder, stamped them with "State's Attorney's Office," and compared the serial numbers on the bills with a list.

On the morning of December 24, 1967, he and Officer Carlyle searched defendant's clothing after his arrest. They recovered two one-dollar bills which were crumpled up to small size in defendant's left pants' pocket. He examined the bills under the infra-red lamp and found they bore the State's Attorney's stamp. He also saw the residue of the fluorescent powder on defendant's hands and left pants' pocket when examined under the lamp.

He asked defendant for his identification and was informed that it was in defendant's basement locker. The witness, defendant, Tuite, Captain Mathis (Captain of Jail Guards), and Carlyle went downstairs where, at the direction of Captain Mathis, defendant opened his locker and gave him his wallet. The wallet contained some bills, including a five-dollar bill that bore the State's Attorney's stamp, visible under the lamp, and matched a serial number on the pre-recorded list.

The witness was then given the tin-foil packets which he inventoried, placed in a sealed envelope signed by Detective Carlyle, and turned over to the Chicago Police Crime Laboratory.

*Patrick Tuite,* for the State:

He is the Chief of the Criminal Division of the State's Attorney's Office.

During the second week in December, 1967, he received a letter from Scott saying that he could help in the Grand Jury investigation of narcotics traffic in the jail. He called Scott to his office and was told by Scott that he could purchase narcotics from defendant. Tuite arranged to have Leotis Clark, who had been working on the investigation, give Scott $25 in marked money to make the purchase. For his help, Clark was given $20 to $25 to buy some clothes.

After the witness' conversation with Scott, he notified Probation Officer John Clarke and arranged to have Clarke at the jail to keep the planned transaction under surveillance.

On December 24, 1967, Tuite went to the jail with three officers. He found Detectives Wallenda and Carlyle with defendant. They examined defendant and two one-dollar bills under an infra-red lamp and he saw a glow on the bills and on defendant's pants' pocket. They took defendant to the basement where defendant, upon request, opened his locker and gave them his wallet which contained a five-dollar bill on the list of pre-recorded funds. Later he received a package of cigarettes containing a tin-foil packet which he turned over to Officer Wallenda.

He took defendant to his office immediately thereafter and informed him of his rights to remain silent and to have an attorney present. He informed defendant that any statement made by him could later be used against him, and that he would be provided free counsel if necessary. Defendant said he understood all of this but wanted to talk to him anyway, and did not want an attorney. As to where he got the five-dollar bill in question, he said he must have gotten it from a gas station as change. He claimed to have gotten the tin-foil packets, which he knew to contain "dope," from a man "out south" whom he had never seen before; that he was not going to deliver them in the jail, but to somebody outside after work. Defendant said he had not made a sale that day.

Scott's burglary charge was *nolle prossed* in return for his cooperation. Scott was later jailed for a parole violation and subsequent burglary charge.

*Fred Finkbeiner*, for the State:

He is the assistant chief correctional officer at the Cook County jail and is familiar with the customs and procedures of the jail administration. Employees of the jail are assigned free lockers to which the administration has a duplicate key. The lockers are subject to periodic shakedowns, and if the administration receives information that an employee might be a security risk, his locker is inspected.

*Stipulation*, for the State:

It was stipulated that if Shirley Krause were called to testify, she would testify that she is a chemist in the Chicago Police Crime Laboratory,

qualified by education and experience; that the substance in the tin-foil packets delivered to her in a sealed envelope by Detective Wallenda was examined by her and found to be marijuana.

*Charles Tidwell,* defendant, in his own behalf:

He worked as a guard for the county jail for nine months, including the time in question. He saw John Clarke as he arrived for work December 24. They walked into the jail together and were both searched. After going down to the basement to put his wallet in his locker, he went upstairs into the jail and was searched again before entering the tier section. He then went to Scott's tier, let Scott into the safety cage, and passed the tier board under the bars so that Scott, who was tier boss, could check on the number of inmates on the tier. He stooped down and pushed the tier board under the bars because it was too wide to fit through the bars. "When I stooped down, the chance appeared that Walter Scott could have put the money in my pocket. I was standing right next to him at that time." Defendant did not sell or dispense any narcotics to Scott.

After passing the tier board to Scott, he removed his jacket and hung it on the control door. Then a guard, Major Taylor, came up and Taylor also talked with Scott, remaining in the area for five or ten minutes. Defendant next walked to another tier. As he was walking, he discovered for the first time that money was in his pocket. After checking several other tiers, he walked back to where he had hung his jacket, noticed that it was on the floor, and put it on.

He had proceeded to another tier when Officer Wallenda and his partner walked in and took him to an office where he was searched. He did not see anything taken from his jacket. They took the two one-dollar bills from his right-hand pants' pocket. He was then taken to his locker and told to open it, which he did, and it was searched. A five-dollar bill was taken out of his wallet, but he did not know where it came from. The money and his hands and clothes were examined under an infrared lamp. He was taken to Tuite's office. He did not remember having any conversation with Tuite concerning the five-dollar bill, and denied having said anything to him concerning tin-foil packets of marijuana.

He testified that he did not have any marijuana or sell the same to anyone on December 24, 1967, or at any other time, nor did he give any money to Scott or receive any from Leotis Clark.

OPINION

Defendant's sole contention on appeal is that the five-dollar bill found in his wallet in the locker was erroneously admitted into evidence. Defendant argues that since no search warrant had been issued, the search

would have to have been incident to the arrest, or consented to by him, to render the fruit of the search admissible.

We believe that the locker search was not incident to defendant's arrest, but we find that it was, nevertheless, lawful and proper. Defendant argues that his was not a genuine, but a coerced, consent to the search under the circumstances shown by the evidence, citing *Bumper v. North Carolina,* 391 U.S. 543, and *People v. Haskell,* 41 Ill.2d 25. This argument would be telling, indeed, if his consent had been critical, or if the search had been of defendant's home rather than of the locker assigned to him at the jail. The basic right of access to the locker, however, was shown to have been that of the jail administration, not defendant's. The Captain of the Jail Guards directed that the search be made, and he would have been derelict in his duty had he not done so. This was the consent relied upon by the State in both the trial court and here, and the position was well taken, in our opinion. The facts were quite similar in *People v. Overton,* 20 N.Y.2d 360, 24 N.Y.2d 522, which involved the search of a student's locker with the consent of the school's principal.

■■ Even if we were to agree with defendant that the locker search was unlawful and the money seized therefore inadmissible, reversal of his conviction would not be required in the light of the harmless error doctrine expressed in *Chapman v. California,* 386 U.S. 18, 22, and *Harrington v. California,* 395 U.S. 250, 254. See also *People v. Landgham,* 122 Ill.App.2d 9, 24. We have set forth the evidence in detail because we think it demonstrates beyond a reasonable doubt that the error in admitting the five-dollar bill (if it was an error) did not contribute to the result. We declare our belief that it was harmless beyond a reasonable doubt. (See *Chapman, supra,* page 24, and *People v. Smith,* 38 Ill.2d 13, 17.) The trial judge, who was the fact-finder in this case, made a similar statement for the record at the time of rendering his decision.

■■ Apart from the five-dollar bill, the evidence was overwhelming as to defendant's guilt on the sale charge. The possession charge was also supported independently by the testimony concerning packets of marijuana found on defendant's person after his arrest, and defendant has raised no question as to the lawfulness of that search.

The judgment of the Circuit Court is affirmed.

Judgment affirmed.

DRUCKER and LEIGHTON, JJ., concur.