THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GERTIE LEE JONES, Defendant-Appellant.

(No. 54219;

First District—June 18, 1971.

Gerald W. Getty, Public Defender, of Chicago, (Judith C. Smith and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Martin Moltz, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE ENGLISH delivered the opinion of the court:

*OFFENSE CHARGED*

Murder. Ill. Rev. Stat. 1967, ch. 38, par. 9—1.

*JUDGMENT*

After a jury trial, defendant was found guilty and sentenced to a term of 25 to 35 years.

*CONTENTIONS RAISED ON APPEAL*

1. Defendant was not proven guilty beyond a reasonable doubt.

2. Defendant was prejudiced by improper questions put to her on cross-examination.

3. The sentence is excessive.

*EVIDENCE*

*Donald Collins,* for the State:

He is a policeman. On May 18, 1968, he and Officer Rice were patrolling in their squad car northward on Wentworth Avenue between 14th

and 15th Streets when he heard four gun shots; the first two shots were in rapid succession, and the third and fourth followed very shortly thereafter. They turned south and drove to where they believed the shots had originated, the corner of 15th and Wentworth. A large crowd was gathered on the corner in front of Cut Rate Liquors. Officer Rice ran into the crowd while the witness remained in the squad car, to maneuver it closer to the crowd. He then got out of the car and, three or four minutes later, Officer Rice yelled to him to call an ambulance. When he went to get into the car to use its police radio, defendant, who was standing near the car, said, "I did it. I killed him."

After he called the ambulance, Rice and two or three men put the victim, who was unconscious, in the back seat of the squad car. Rice told him to "take her also," and he believed this was a reference to defendant. Defendant got into the passenger's side of the squad car. He did not talk to defendant on the way to the hospital, but believed her to be a relative of the victim. He noticed an odor of alcohol coming from the victim.

*Henry Rice, Jr.,* for the State:

He is a patrolman and was on duty with Donald Collins on May 18, 1968. At approximately 4:35 P.M., while driving north on Wentworth, he heard four shots. He turned back in the direction from which the shots came, and pulled up to a large crowd. He entered the crowd and saw the deceased, who was in a semi-conscious state, and had a small hole just below his neck. One bullet had entered his body. James Ivy, who was dead at the time of the trial, was holding the deceased's head, and told him that defendant had shot the victim. He approached the entrance of Cut Rate Liquors, where he saw defendant and asked her where the gun was. He told defendant that she would have to accompany him, that she was under arrest, and directed her to get in the squad car with Officer Collins. The body of the victim was placed in the back seat, and he went to the hospital in another car since the squad car was full. Defendant made no attempt to flee and he did not handcuff her.

*James Hatchett,* for the State:

He was the brother-in-law of the deceased, Odell Banks, and he knew defendant. On May 18, 1968, between 4:00 and 5:00 P.M., he saw Odell outside Cut Rate Liquors. Odell asked him for money for booze and he refused. A few minutes later defendant walked up and said to Odell, "You have my old man's coat." Odell replied, "Your old man have my coat." The witness did not tell Odell that he did not have to take that from defendant. He left the parties on the sidewalk and went into the tavern. About two minutes later, he heard four shots. He was standing four to five feet from the screen door entrance to the tavern and saw defendant walking backwards past the door, firing once or twice as she

backed out of his sight. He then saw Odell walk into sight and heard him say, "You hit me, Gertie Lee," before falling. When he fell, he had a wine bottle in his hand. The witness went outside where he saw James Ivy and defendant bending over the body. Defendant was removing dirt from Odell's face. She said to Ivy, "Leave him alone, I hope he dies." Moments later the police arrived.

*Patricia Evans,* for the State:

She was sitting in Cut Rate Liquors at the time of the shooting. She had seen Odell Banks outside the tavern, and as she went in, she saw defendant coming out. Defendant said something to her that indicated that she was angry with someone. When the witness was inside the tavern, it was not noisy, the juke box was not playing, and she could hear a conversation outside the door. Then she heard a shot, went nearer the door, and saw defendant backing past, firing a gun three more times. She didn't hear defendant say anything. About a minute or two later, defendant entered the tavern and said, "Call the police, I shot him."

*Betty Ann Jones,* for the State:

She was the deceased's cousin. Shortly after 4:30 P.M., on May 18, 1968, she went to Cut Rate Liquors to look for her brother and boyfriend. She spoke with James Hatchett in the tavern near the door for 5 or 6 minutes before turning to leave, not having found the people she was seeking. As she was about to leave, she heard a shot, and saw defendant, who was 3 feet from her, backing up to a wall, pulling the trigger of a gun. She then went outside, saw Odell standing against the wall of the tavern, and heard him say, "Gertie, you done hit me." He had a pint of wine in his hand, and fell to the ground, face down. She turned him over and started cleaning the dirt from his face. While she was in the tavern, she did not hear defendant or deceased arguing with anyone.

*Stipulation:*

It was stipulated that Odell Banks' death was caused by a single bullet in the neck.

*Pauline Wilson,* for the defense:

She had known defendant for about 10 years. She was across the street from Cut Rate Liquors at the time of the shooting. She was supposed to meet defendant to go to the hospital to see defendant's sister. She saw defendant and the deceased standing about three feet apart outside the liquor store. Odell was holding a wine bottle by its center, and was holding it up, as if he were going to take a drink. She saw only defendant's back from where she was standing, but heard defendant say, while backing up, "Leave me alone, don't come up on me." She then heard a shot and ran into the alley, where she remained for 5 minutes

before going to a restaurant. She did not talk to the police at the time of the shooting.

*Gertie Lee Jones,* in her own behalf:

On May 18, 1968, she had been at Cut Rate Liquors and left at 3:00 P.M. to do some shopping with her boyfriend, niece, and nephew. She purchased some gifts to take to her sister who was in the hospital, and returned to her apartment, which was across the street from Cut Rate Liquors. She prepared to go back to Cut Rate Liquors, where she was to meet Pauline Wilson who was going to accompany her to the hospital. After returning from shopping, she took a gun from her boyfriend, A. G. Anthony, and put it in her purse. Before leaving, Anthony told her to tell Odell Banks to return his coat if she saw him.

She went across the street to Cut Rate Liquors, saw Odell, and told him to return Anthony's coat. Odell answered that he would not return the coat until Anthony had his (Odell's) cleaned. She told him that she wasn't going to argue with him because she was on her way to the hospital. James Hatchett and James Ivy said to Odell, "You don't have to take that off of that bitch," and "You ought to kick her ass." She started to leave and one of them hit her in the back from behind. She started to run, and Odell followed, saying, "Bitch, I'll kick your ass." He threatened her with a raised wine bottle and she thought he was going to hit her with it. She took the gun from her purse and fired a shot into the air. She continued backing up, firing more shots, as Odell repeated his threats and called her nasty names in a loud voice. She fired four shots, shooting past him, and did not know which one hit him. She did not intend to kill him.

When she quit shooting, Odell stopped, took a step, and said, "Gertie, I am shot, please help me." She went into Cut Rate Liquors and asked someone to call the police. Then she went outside and waited. Her boyfriend took her purse which contained the gun. When the police arrived, she told Officer Collins that she had shot Odell, and she was taken to the hospital. She denied saying that she wished Odell dead, but testified that her boyfriend said it. She tried to help wipe the dirt off Odell's face. Odell did not appear to be drunk, but he had been drinking with Hatchett and Ivy at the side of the liquor store.

*OPINION*

■■ Defendant's first contention is that she was not proven guilty beyond a reasonable doubt because her claim of self-defense was not rebutted. The State, of course, has the burden of proving every element of the offense charge, including the absence of justifiable use of force in self-defense where that issue is raised. (Ill. Rev. Stat. 1967, ch. 38, par.

3—2; *People v. Warren*, 33 Ill.2d 168, 173.) Heavily relied on by defendant in the instant case is *People v. Jordan*, 4 Ill.2d 155, 163, in which the defendant, who was charged with manslaughter, claimed self-defense and was the only witness to the occurrence from which the charge arose. The court held that where the defendant's version of the incident was probable, corroborated, and uncontradicted in its material parts, the jury was not at liberty to reject the defense. We find, however, that in the case now before us, defendant's testimony was essentially uncorroborated and was contradicted in a number of material respects.

First, James Hatchett denied provoking an alleged attack on defendant by telling Odell that he did not have to take "that kind of talk" from defendant. Second, there was the testimony of Betty Ann Jones. For 5 or 6 minutes she had been standing with James Hatchett inside the screen door of the liquor store, only 2 to 3 feet from where defendant backed by prior to firing a gun. Betty Ann had not heard Odell or defendant arguing with anyone, although defendant testified that Odell was calling her nasty names and threatening her in a "very loud" voice. Further, Patricia Evans testified that the tavern was not noisy, that the juke box was not playing, and that she could hear a conversation outside the door. She saw defendant backing past the door, firing shots, but did not hear her say anything. Finally, Pauline Wilson, who was called on behalf of defendant, testified that she heard defendant say "Leave me alone, don't come up on me," but she did not testify to any remarks made by the deceased who was only 3 feet from defendant. Nor did Pauline corroborate defendant's testimony that the deceased had threatened defendant with a wine bottle, but testified only that he was holding it up "like he was going to take it to his mouth or something  *  *  *  not up over his head as though he were going to strike somebody." We find that, considering the entire record, the evidence was sufficient to prove defendant guilty beyond a reasonable doubt, and the jury could properly have rejected defendant's claim of self-defense.

Defendant's second contention is that she was prejudiced by improper questions put to her by the prosecutor during cross-examination. The exchange to which she objects is as follows:

Q. "You went out there looking for trouble?

A. I didn't go out there looking for trouble.

Q. And in Chicago Heights you are known to look for trouble?"

An objection was interposed and sustained by the court. Defense counsel then moved for a mistrial based upon these questions. The motion was denied, but the jury was instructed to disregard the questions and answer. Further, in her cross-examination the prosecutor asked defendant:

Q. "Did it make you feel big to kill a man, Mrs. Jones?" Objection was again sustained.

■■ We can see no excuse for the prosecutor's having questioned defendant in this manner. It appears obvious that he had an improper motive in doing so. However, to reverse defendant's conviction on this ground, we would have to conclude that the asking of these questions contributed to the jury's verdict; and we think it did not. Contrariwise, we declare that close consideration of the record in this case dictates our belief that the offending questions were harmless beyond a reasonable doubt. See *Chapman v. California*, 386 U.S. 18, 22; *Harrington v. California*, 395 U.S. 250, 254; *People v. Tidwell*, 133 Ill.App.2d 1, 266 N.E.2d 787; see also the court's discussion in *People v. Lucas*, 48 Ill.2d 158.

■■ In her brief, defendant also requests this court to reduce her sentence. At the hearing in aggravation and mitigation, it was brought out that, over a 9-year period prior to the instant offense, defendant had been convicted of four misdemeanors and one felony (voluntary manslaughter in October, 1965). We find no basis for reduction in sentence under the applicable principles so often set forth as to require no citation of authority.

The judgment and sentence are affirmed.

Judgment affirmed.

DRUCKER and LORENZ, JJ., concur.