(No. 39081.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.*
AARON C. WARREN, Appellant.

*Opinion filed September 28, 1965.*

JOHN A. PIGOTT, of Chicago, appointed by the court, for
appellant.

WILLIAM G. CLARK, Attorney General, of Springfield,
and DANIEL P. WARD, State's Attorney, of Chicago, (FRED
G. LEACH, Assistant Attorney General, and ELMER C. KIS-
SANE and WILLIAM J. NELLIS, Assistant State's Attorneys,
of counsel,) for the People.

Mr. JUSTICE UNDERWOOD delivered the opinion of the
court:

Leave to appeal was allowed to review a First District Appellate Court affirmance of defendant's conviction of murder and 16-to-25-year sentence following a jury trial in the circuit court of Cook County. 52 Ill. App. 2d 374.

For convenience, we quote the concededly correct evidentiary situation as set forth in the opinion of the appellate court:

"* * * Frank Slavik, bartender at the Golden Lantern Tavern, 4519 South Harlem Avenue, testified that on May 27, 1962, the defendant and the deceased, Alexander Hardie, Jr., entered the tavern about 9:00 P.M. After about a half hour, during which time they consumed two glasses of beer, Hardie left and defendant followed five minutes later.

"Matthew Padgen, owner of the Hickory Gardens, a tavern located next door to the Golden Lantern, testified that the defendant and deceased entered his tavern at about 9:30 P.M., had two glasses of beer each and stayed about a half hour. They left together and entered a brown Nash Rambler station wagon that was parked in front of the tavern. He jotted down the license number of the car. At about 11:45 P.M. defendant returned alone and asked if his partner had come back. Upon being told that he had not, defendant turned and walked out.

"Robert H. Brownell, and his partner, Burton Stieg, police officers of the Village of Lyons, shortly after midnight, while patroling in their police vehicle, came upon the body of the deceased, still warm, lying in Hass Avenue between Oakwood and 40th. This area is sparsely inhabited. There is a forest preserve on the west side of the street and on the east side a tavern, catering 'house' and further 'up' north there are a few new apartment houses. A Stickney police ambulance was called and the body was taken to a hospital where deceased was pronounced dead. There were two bullet holes in the chest. In the deceased's clothes the police found a key ring with some car keys and a veteran's license identity tag. There were also some small pills.

These, upon examination, consisted of two pills containing a barbiturate acid commonly referred to as a hypnotic drug and six scored tablets found to be amphetamine, which is commonly referred to as a stimulant drug. The pills were nonnarcotic.

"Officer Raymond Dus of the Stickney police, who responded to the call for an ambulance, and who removed the body to the hospital, testified that he looked for and found deceased's car in front of the Hickory Gardens Tavern. He spoke to some of the 'citizens', then called the Lyons police and with them proceeded to defendant's home. Officer Dus knew the defendant prior to the date of the occurrence. Defendant's 'yellow and brown' Nash Rambler was found parked in front of his home. He was requested to accompany the officers, after the police had searched the car with his permission. An expended bullet shell was found immediately behind the front seat on the floor of the car and there were blood stains on the back seat. When confronted with Padgen and Slavik at the tavern sites, defendant denied being in the taverns that night or having seen them. Later, at the Lyons police station, defendant denied knowing the deceased. Upon being told that the card of Alexander Hardie was found in his wallet, he stated that it was a reference to a girl who was married and that he used the name so as to avoid getting her into trouble. He told a story of his activities for the day and evening and said he got home at 1:30 A.M. This story eliminated any presence in the taverns or being in the company of the deceased. He explained the presence of blood in the car as coming from a cut finger he got helping his father that day with some concrete work. The cartridge shell, he said, was the result of 'shooting with it, with a friend in the boondocks'. During the questioning he asked and was allowed to talk to officer Dus alone and shortly thereafter defendant made a statement which was reduced to writing.

"In this statement the defendant said that he was to meet the deceased Hardie by appointment at the tavern on Harlem Avenue. When he got there Hardie had not arrived. He went to the adjoining tavern still seeking him. As he came out of the second tavern Hardie arrived. Hardie asked about 'the tires' and he said he didn't have them with him. At Hardie's request they re-entered the Hickory Gardens and 'then got into my car and drove for a short way' into the forest preserve. 'He already had the gun which I gave him in Summit, Illinois.' Hardie then told defendant to drive some distance and stop. Hardie then said 'You lied to me, you haven't got the tires, the money, you haven't got "s——t".' Hardie told him to get out of the car and started to open the door on his side. Pointing the gun at him Hardie said, 'No tires, no money, no car, no you.' 'Then I struggled for the gun and the gun went off twice. I put the car in reverse and he was leaning against the door and he fell out.' Defendant then drove off. The police officers went to defendant's home and found the gun between the mattress and box spring of his bed.

"At 10:50 A.M. defendant made another written statement under interrogation by an assistant state's attorney. In this statement he said he met the deceased about three and a half months previously in a tavern on Harlem Avenue. They became chums and he disclosed to the deceased that he had recently been released from the penitentiary. The deceased thereafter began to blackmail him by threatning to expose his penal record to his employer. Defendant, over the period, had given the deceased about 40 tires costing approximately $1,000 purchased through his father's credit card. He had also given Hardie about $200 in currency which he had saved up from his earnings. On May 27, 1962, he met Hardie in front of the tavern 'in Summit.' Hardie asked for the gun and after receiving it asked where the tires were. He told Hardie he had them but could not give them to him. He said he lied. Just before they left

the tavern Hardie showed him two pills and asked if he was willing to sell 'these.' When defendant refused the deceased got 'salty,' cursed him and said they were going for a ride.

"They drove off in defendant's car leaving Hardie's car at the tavern. After driving into the forest preserve, 'all he did was bitch and moan and gripe and told me what I was and told me what his wife was'. Defendant then took the wheel and drove around within the Lyons vicinity. Hardie was arguing and trying to talk defendant into selling the pills. After some period of driving, Hardie told defendant to stop the car. He pointed the gun at him and told him to get out. The deceased screamed and stuck it in defendant's face. 'His door was open when he stuck the gun in my face. I grabbed for it'. He thought he got the gun. 'I was sitting on top of him. My weight was on his body. When I pushed up on the gun, I put my weight on his body and then I remember hearing two shots.' Defendant then drove off causing the deceased to fall out. He put the gun between the mattress and bed spring of his bed when he got home."

The above constitutes substantially all of the evidence in the case. Defendant did not take the stand.

Defendant's major argument herein is that under section 7—14 and section 3—2 of the Criminal Code (Ill. Rev. Stat. 1963, chap. 38, pars. 3—2 and 7—14) the evidence is insufficient to establish guilt beyond a reasonable doubt in that the People failed to prove that the killing was not in self-defense.

Section 7—14 provides that self-defense is an affirmative defense. Section 3—2 provides:

"(a) 'Affirmative defense' means that unless the State's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, must present some evidence thereon.

"(b) If the issue involved in an affirmative defense is raised then the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense."

Defendant maintains that the exculpatory language contained in the statements raised the issue of self-defense, rendering it incumbent upon the State to prove beyond a reasonable doubt that the killing was not in self-defense (the State concedes that the exculpatory language contained in defendant's statements has not been directly rebutted), and that the State therefore has not met its burden.

We agree that under the Criminal Code, where the issue of self-defense is interposed, the burden devolves upon the State to prove beyond a reasonable doubt that the act was criminal (see S. H. A., chap. 38, sec. 3—2 and committee comments thereunder) and that language in *People* v. *Washington,* 27 Ill.2d 104; *People* v. *Wiggins,* 12 Ill.2d 418, and *People* v. *Kelley,* 29 Ill.2d 53, to the effect that the burden of *proving* mitigating or justifying circumstances is upon the defendant once the killing by defendant's conduct is shown is at first glance capable of misinterpretation. However, a thorough reading of those cases clearly indicates that the burden referred to as the defendant's is only that of producing evidence to raise the self-defense question unless that issue arises from the State's proof. Once the affirmative defense is interposed, by the introduction of "some evidence" (sec. 3—2(a)) by either the State or the defense, the burden of proving guilt beyond a reasonable doubt as to that issue, as well as all other necessary elements of the offense, is placed upon the State. See *People* v. *Durand,* 307 Ill. 611, 620; *People* v. *Willy,* 301 Ill. 307, 333-34; *Appleton* v. *People,* 171 Ill. 473, 477-78; *Lyons* v. *People,* 137 Ill. 602, 619, *Alexander* v. *People,* 96 Ill. 96, 102-03.

Here, however, we cannot say that the exculpatory parts

of defendant's statements, when viewed in the light of his prior inconsistent statements and conduct (i.e. denying any knowledge of the affair; leaving the scene of the killing without seeking medical assistance; returning to the Hickory Gardens Tavern to ask if the deceased had returned during defendant's absence, hiding the gun, *etc.*) are sufficient to raise a reasonable doubt of defendant's guilt on the issue of self-defense.

Defendant argues that in the absence of evidence directly rebutting his exculpatory language, the jury was bound to accept the statements as true, relying principally upon *People* v. *Jordan,* 4 Ill.2d 155. There, however, no substantial inconsistencies appeared between defendant's conduct and his exculpatory statements, which is simply not so here. Here, as in *Jordan,* there was only one direct version of the incident in question, but there the defendant's statements were entirely corroborated by the surrounding facts and circumstances. Clearly, where defendant's statement is contradicted by the facts and circumstantial evidence, as here, a jury need not believe it, even though it is not directly contradicted by other witnesses. (*People* v. *Strause,* 290 Ill. 259; see also *People* v. *Skelly,* 409 Ill. 613.) Similarly, "[T]he exculpatory part *need not be believed;* * * *; it is never denied, and citations in detail are unnecessary. As a warning or help to the jury, this statement may be desirable. But obviously it is in law a superfluous statement. No witness *need* be believed * * *; the jury may always believe as much or as little as they please of his testimony." (Emphases in original). VII Wigmore on Evidence, § 2100 (3d ed. 1940).

We therefore hold that where a defendant's exculpatory statements alleging self-defense are effectively impeached by his prior inconsistent conduct and statements and the uncontradicted facts and circumstantial evidence so as to render them improbable, a jury need not accept them as true, even though the State does not (as in most instances,

where there are no occurrence witnesses other than defendant, it cannot) directly rebut the exculpatory language.

For the foregoing reasons, the judgment of the Appellate Court for the First District is affirmed.

*Judgment affirmed.*