THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRANK E. BAILEY, Defendant-Appellant.

(No. 59347;

First District (1st Division)—March 17, 1975.

Paul Bradley and Laurence A. Benner, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Thomas D. Rafter, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE BURKE delivered the opinion of the court:

The defendant, Frank E. Bailey, was charged by a four-count indictment with the murder of Robert Lawrence and the aggravated battery of Charles Lawrence. In a bench trial, the court granted the defendant's motion for a finding of innocent regarding the two counts of murder on the ground that the defendant acted in self-defense; but the defendant was found guilty of the two aggravated battery counts and was sentenced to a term of 1 to 8 years in the penitentiary. The defendant appeals from these two convictions entered in the circuit court of Cook County raising five issues on appeal: (1) the defendant did not knowingly and intelligently waive his right to counsel; (2) the defendant did not knowingly and intelligently waive his right to a jury trial on the aggravated battery charges; (3) the defendant was denied due process of law by the court's denial of the defendant's motion to be given sufficient opportunity to interview the witnesses to the shooting; (4) the State did not prove beyond a reasonable doubt that the defendant was not acting in self-defense when he shot Charles Lawrence; and (5) the defendant should not have been convicted of two counts of aggravated battery when both counts resulted from the same conduct.

Frank E. Bailey's two convictions for aggravated battery grew out of an incident in which the defendant shot both Robert and Charles Lawrence who were brothers. Robert Lawrence died as a result of two bullet wounds the defendant inflicted. The defendant was acquitted of the murder of Robert Lawrence in a bench trial by a finding that the

defendant had acted in self-defense when the defendant fired the fatal shot at Robert Lawrence. However, the court did not find that the defendant had acted in self-defense when he shot Charles Lawrence. The defendant was, therefore, convicted of two counts of aggravated battery. The evidence taken in this matter was presented at the defendant's bond hearing which was transformed into a trial by the mutual agreement of the defendant and the prosecution during that proceeding. The defendant acted as his own defense counsel in the matter.

The events leading up to the shooting, except for the last few moments before the shooting, were not in substantial dispute. The shooting took place in a third-floor apartment at 6012 South King Drive in Chicago, Illinois, during the afternoon of February 27, 1973. Eight persons were present during the shooting and the events which led to that shooting. These persons were Shirley Henderson, the lessee of the apartment; Corney Houston Bey, Shirley's boyfriend; Alice Tyler; Robert Lawrence, the deceased; Charles Lawrence, Robert's brother; Cleo Atkins, Charles' Lawrence's stepson; the defendant, Frank E. Bailey; and Richard Bryant, an acquaintance of the defendant. All of these persons were called as State witnesses except for the deceased, the defendant who testified in his own behalf, and Alice Tyler who did not testify.

All the witnesses except Cleo Atkins testified that the defendant was the last to arrive and that he arrived alone, apparently looking for Richard Bryant who was to play basketball with the defendant. Atkins testified that the defendant and Bryant arrived together. Shortly after the defendant arrived, he and Robert Lawrence, the deceased, got into a very vocal argument. The nature of this argument was never disclosed. The defendant and Richard Bryant then left the apartment. Robert and Charles Lawrence went out into the hall after them, and the argument between Robert and the defendant continued. At some point Robert Lawrence became aware of the fact that the defendant had a gun in his pocket. Robert accused the defendant of "pulling a gun on him." The defendant denied this and handed the gun to Richard Bryant as a show of good faith. Bryant placed the gun in his pocket. The argument continued. Those still inside the apartment asked them to come inside, apparently because of a phone call complaining of the noise in the hall.

The defendant and the two Lawrence brothers returned to the apartment. Richard Bryant, who was still in possession of the gun, remained outside for a short time and then re-entered the apartment. The argument between Robert Lawrence and the defendant was still going on. Shirley Henderson and the defendant testified that Robert Lawrence challenged the defendant to a fight. Shirley Henderson testified that Robert said to the defendant, "I am going to kick your ass." The defen-

dant, Shirley, and Richard Bryant testified that the defendant refused to fight and demanded to be allowed to leave the room. Robert Lawrence, they testified, refused to let the defendant leave. Charles Lawrence was then standing with Robert in front of the door. Five of the six witnesses to the occurrence testified that they heard Robert say to the defendant that the only way that the defendant was going to leave the room was "out the window." Three witnesses testified that the window in the apartment was open. The apartment was on the third floor.

The Lawrence brothers' attention then turned to the fact that Richard Bryant was still holding the defendant's gun. Corney Bey testified that Robert said he was going to get the gun. Bey also testified that both Robert and Charles Lawrence then patted Richard Bryant for the gun and pulled on Bryant, urging him to go with them. Bryant refused to give up the gun. Bryant testified that Robert Lawrence demanded to see the gun and that Charles Lawrence said, "Well, you know we can just take it from Shank [Bryant's nickname]." Shirley Henderson testified that Robert Lawrence had demanded the gun from the defendant. Charles Lawrence also testified that his brother Robert had demanded the gun from Bryant. Bryant then testified that after the demands for the gun were made on him, Charles Lawrence started advancing toward Bryant. At this point the defendant asked Bryant for his gun and grabbed it from Bryant.

What happened during the next few moments was in some dispute among the witnesses. Shirley Henderson, a witness for the State, testified that when the defendant asked for his gun from Bryant, she ran into the closet. The shots were fired while she was in the closet.

Richard Bryant, another State witness, testified that after the defendant grabbed the gun he put it in his pocket. Robert and Charles Lawrence both advanced on the defendant. The defendant then pulled the gun out of his pocket and cocked it and said, "Man, get out from in front of the door." Corney Bey then got between the defendant and Robert Lawrence but jumped back when the defendant pointed the gun. The defendant began firing. The first shot hit Robert Lawrence who was only two feet from the defendant. Charles Lawrence then rushed the defendant and was hit by the second shot. Charles was almost "on top" of the defendant when he was shot. Bryant then testified that he, Bryant, headed for the door and heard two more shots as he was exiting.

Corney Bey, a State's witness, testified that after the defendant had retrieved the gun from Bryant, Robert Lawrence began advancing on the defendant. The defendant pulled the gun out of his pocket where he had placed it. The defendant told Robert to get out of the way and Robert replied that the only way the defendant was going to go was out the

window. Bey then stepped in between Robert and the defendant. The defendant then pointed the gun and Robert pushed or motioned Corney Bey out of the way and continued toward the defendant. The defendant fired at Robert Lawrence when Robert was about 3 feet away. At this time, Corney Bey testified, Charles Lawrence was behind Robert and about 6 feet from the defendant. Corney Bey then headed for the closet in the room. Before he got into the closet he heard two more shots. When Bey came out of the closet he observed Robert and Charles lying on the floor together.

Cleo Atkins, another witness for the State and Charles Lawrence's stepson, testified that when the defendant got his gun back he was near the window. Robert and Charles Lawrence were near the door, about 12 feet from the defendant. The defendant, Atkins testified, moved away from the window toward Robert and Charles and begin firing. The first shot hit Robert and the second shot hit Charles. Robert and Charles fell to the floor and defendant fired two more shots at the Lawrence brothers.

Charles Lawrence, also a witness for the State, testified that the defendant was near the window when he got his gun back from Richard Bryant. Charles was standing next to his brother near the door. The defendant then pointed the gun at Robert, and Charles tried to push his brother Robert out of the way at the moment his brother was shot by the defendant. Robert's fall tripped Charles. As Charles was falling, he testified he was hit by the defendant's second shot. Charles fell on top of Robert. Both Charles and Robert tried to get up but were each struck by another shot fired by the defendant. At this time, Charles testified, the defendant was "still standing close to my brother."

The defendant testified in his own behalf. He testified that after he took his gun back from Bryant, Robert Lawrence demanded that the defendant turn over the gun. The defendant refused and both Robert and Charles Lawrence began moving toward the defendant. The defendant backed up to the open window. Robert said he was going to push the defendant out the window. The defendant then took his gun out of his pocket where he was keeping it. Corney Bey then got between Robert Lawrence and the defendant, putting a hand on Robert's chest to halt his advance. Robert swung Corney into the wall and then reached for the defendant. The defendant testified he than started shooting. "I just— I shot at all—at both of them and  *  *  *  Cleo went to screaming and just stopped all my attention and I stopped [firing]."

Many of the witnesses testified that the room where the shooting took place was very small. Bryant estimated it to be 9' x 12', Corney Bey estimated it to be 10' x 12', and the defendant said it was a "twelve foot room." Whatever the precise locations of the defendant and the Law-

rence brothers at the time of the shooting, they all were at very close quarters. The room contained only one door and a window which was then open.

Jerome Lawrence, Robert and Charles Lawrences' brother, was called to testify by the defendant. Jerome testified that "Robert Lawrence was all right until him and Charles Lawrence got together." He also testified to several incidences in the past in which Robert and Charles Lawrence had kicked and slapped Jerome's wife, and when Charles Lawrence had threatened Jerome's family and got into a fight with Jerome which resulted in Jerome stabbing Charles with a knife. Jerome then testified that the defendant, Frank Bailey, who was a cousin of the Lawrences, was well acquainted with Robert and Charles. Richard Bryant, a State witness, testified on cross-examination that Robert Lawrence's "hobbies" included weight lifting and "beating up people." The defendant testified that he knew his two cousins, Robert and Charles Lawrence, very well and that "[t]hey would just do anything."

At the close of the State's case the trial judge, upon defendant's motion, made a finding of not guilty on the two murder counts. The court found that the defendant was acting in self-defense when he fired the first shot, which proved the fatal one, that struck Robert Lawrence. The court, however, refused at that time to find for the defendant on the two aggravated battery charges relating to the shots fired that wounded Charles Lawrence. At the conclusion of the trial, the court entered a finding of guilty on both counts of aggravated battery. The court found that while "we are dealing with men of violence here on both sides" and the defendant had fired the first shot in self-defense, there was "a lapse between the shots that were fired as stated by the witness Cleo Atkins, and certainly the additional shooting wasn't necessary."

The defense contends that the State failed to prove beyond a reasonable doubt that the defendant was not acting in self-defense when he fired the shots which struck Charles Lawrence. The defendant argues that there was no evidence to support the court's conclusion that there was a lapse between the shots the defendant fired. The evidence, the defendant contends, only shows that all the shots fired were fired by the defendant in rapid succession at the defendant's two attackers, Robert and Charles Lawrence. Therefore, if the initial shot was found to have been fired in self-defense, one must conclude that the remaining shots were also fired in self-defense. We are of the opinion that the defendant's contention is correct.

A person is justified in the use of deadly force when that person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself * * *." (Ill. Rev. Stat. 1971,

ch. 38, par. 7—1.) Once the issue of an affirmative defense such as self-defense has been raised, the State must prove beyond a reasonable doubt that the defendant was not acting in self-defense. Ill. Rev. Stat. 1971; ch. 38, par. 3—2(b).

Robert Lawrence had threatened to beat up the defendant, had refused to let the defendant leave the room, had threatened to throw him out the window, had tried to get the defendant's gun even though the defendant made numerous efforts to avoid using it, and according to the testimony of most of the witnesses, was advancing toward the defendant from close quarters when the shooting occurred. The court found that the defendant was justified in initially firing at Robert Lawrence.

The evidence also is clear that the defendant reasonably believed that it was necessary to use the same force against Charles Lawrence. The testimony of three witnesses, one of them for the State, established that both Robert and Charles Lawrence were violent individuals, who while working in concert had beaten up other persons in the past, and the defendant was aware of these facts. Charles was supporting his brother Robert. Charles stood with his brother blocking the door and had followed his brother into the hall earlier in the argument. Several of the State's witnesses testified that Charles attempted to get the defendant's gun from Richard Bryant by demands or by patting Richard Bryant. Charles Lawrence by his testimony placed himself next to his brother, trying to push him out of the way when he was shot. That testimony would place the defendant and the two Lawrence brothers in close proximity. The room was quite small, not more than 12 feet in length, which would place all the participants within a few steps of each other. One witness for the State testified that after the defendant fired the initial shot at Robert Lawrence, Charles rushed the defendant from close quarters. We find that the defendant reasonably believed that it was necessary to use the force he did against Charles Lawrence in self-defense when he fired at Charles initially.

■ ■ It was found by the court, however, that there was a lapse between the shots fired by the defendant that made the additional shooting unnecessary. Because the defendant was initially justified in firing, it was incumbent upon the State to prove that a sufficient time interval passed between the initial shots and the subsequent shots which would have allowed the defendant, acting as a reasonable man, to realize that no further shooting was necessary. (*Brown v. United States,* 256 U.S. 335.) Apparently a total of four shots were fired by the defendant. The first struck Robert, the second struck Charles, and the last two struck each of the victims once. If there was such an interval between these shots, it could have been easily established by the prosecution. However, the

prosecution failed to ask any of the witnesses how much time elapsed between the first and final shots. The court relied on Cleo Atkins' testimony in finding a lapse between the shots. However, Atkins only testified that the two Lawrence brothers were on the floor by the time the last two shots were fired. Atkins was never asked how much time elapsed between the first and last shots.

What evidence there is on this matter points to the fact that no more than about 2 seconds elapsed between the defendant's first and last shot. Two of the State's witnesses, Corney Bey and Richard Bryant, testified that they headed for the closet and the door respectively when the shooting started. They heard the last two shots before they had either reached the closet or had exited. It was a small room in which no one was more than a few steps from the door or the closet. It would take a person no more than a few seconds to take these several steps. Those few seconds were, according to the evidence available, the only interval between the first and the last shots. This would corroborate the defendant's testimony that when he started firing he "just—I shot at all—at both of them and * * * Cleo went to screaming and just stopped all my attention and I stopped [firing]."

■■ When it has been found that a defendant was initially firing in self-defense, courts have been reluctant to find that a span of only a few seconds was a sufficient time for the defendant to realize that further shooting was unnecessary. In a case very similar to ours, *People v. Mc-Graw*, 13 Ill.2d 249, 149 N.E.2d 100, the defendant had fired a number of shots at a police officer who had unjustifiably beat him and apparently was going to continue beating him. One witness testified that the officer fell after being shot twice, and that the defendant then walked over to the officer and shot him four more times. Other witnesses testified that they heard all the shots fired in rapid succession. All six bullets in the gun involved were expended. The court held that the State had not proved beyond a reasonable doubt that the defendant was not acting in self-defense. The question of the apparent necessity of the shooting, the court reasoned, had to be viewed through the eyes of the defendant.

■■ In *Brown v. United States*, 256 U.S. 335, there was evidence that the victim was down when the defendant fired his last shot. When the shooting started, the defendant had been acting in self-defense. The court held that the fact the defendant may have fired the final shot when the victim was down was not enough to prove that the defendant had ceased to be reasonably acting in self-defense because the State had failed to prove that this final shot did not follow close upon the others. As the Illinois Supreme Court stated in a subsequent case:

"The law does not charge an individual, when he has reasonable

grounds to believe himself in apparent danger of losing his life or suffering great bodily injury, to use infallible judgment. It would be unreasonable to require such an exercise of careful judgment in the space of a few seconds while one [is] under great stress and excitement * * *." *People v. Motuzas*, 352 Ill. 340, 346, 185 N.E. 614, 617.

The defendant was acting in justifiable self-defense when he fired the first shots at Robert and Charles Lawrence. We are of the opinion that there was no evidence which established a sufficient interval between the time these shots were fired and the time the final two shots were fired which would have allowed the defendant to realize he was no longer in danger. The State failed to prove the defendant guilty beyond a reasonable doubt. It is unnecessary to consider the other issues raised by the defendant on appeal.

The judgment is reversed.

Judgment reversed.

EGAN and SIMON, JJ., concur.