THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HARRY HARLING, Defendant-Appellant.

(No. 60752;

First District (1st Division)—June 16, 1975.

James J. Doherty, Public Defender, of Chicago (Thomas J. Royce, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Raymond J. Prosser, and Michael J. Goggin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

Harry Harling (defendant) was indicted for murder (Ill. Rev. Stat. 1971, ch. 38, par. 9—1). After a bench trial, he was found guilty of voluntary manslaughter (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(b)), and sentenced to 3 to 9 years. He appeals.

Defendant urges here that he was acting reasonably when he stabbed the deceased, or, in effect, that he used justifiable force such as he reasonably believed was necessary to save himself from imminent death or great bodily harm (Ill. Rev. Stat. 1971, ch. 38, par. 7—1). The People respond that the proof shows beyond reasonable doubt that defendant's belief regarding necessity for use of force was unreasonable so that he was properly found guilty of voluntary manslaughter.

Defendant and the victim were both patrons in a tavern. They were similar in height, with the victim being about 6 feet tall and defendant 5 feet 11 inches. However, defendant was approximately 50 pounds heavier.

Another patron testified that a difference of opinion arose regarding whether or not defendant had placed a $5 bill on the bar. Defendant stated that he did and that the bill had disappeared. The victim contradicted this statement. One word led to another and a wrestling match, or fight, between the two men began. In a short time the victim had defendant down on the floor on his back and was on top of him. The men then got up and shook hands. The witness then saw defendant walk toward the door with the victim following perhaps 4 or 5 feet behind. This witness saw the victim reach the front door, presumably after defendant had left in front of him. The witness then turned away and next observed defendant standing some 2 feet inside the front door and saw a person, that he later realized was the victim, lying on

the floor flat on his back and bleeding. He did not at any time see a knife in defendant's possession. He estimated that 7 or 8 seconds elapsed between the time he saw the victim leave from the front door and when he observed him on the floor.

The bartender verified the conversation regarding the presence of defendant's $5 bill on the bar. He saw the defendant then strike the victim after which there was a fight and a wrestling match. He then heard defendant, in effect, concede that his opponent had been the victor and thought he heard defendant say, "Let's be friends." During this altercation, the witness saw the victim holding the defendant by his neck. He next saw the parties walk toward the door with defendant slightly in advance. The victim then gave defendant a hard slap on the head with his open hand and both of them walked out the door. The bartender next observed the victim backing into the tavern. He took a bar stool and then fell, with face up. He then saw that defendant had returned, almost at the same time, and was standing near the victim's feet. Up to that point he had not observed a knife. In about a minute some police officers entered the tavern. They exhibited a knife to him. He estimated that about 1 or 2 minutes elapsed between the time the victim left and the time that he reentered.

One of the police officers testified that he was driving by and observed defendant walking out of the tavern. After two steps, defendant looked in the direction of the police car, turned quickly about and went back to the tavern. The officer entered and saw the victim lying on the floor with stains about his shirt. He then saw defendant bending over a pinball machine and asked what he was doing. Defendant responded that he was looking for his glasses. After speaking to the bartender, the officer told defendant that the person upon the floor had either been shot or stabbed. Defendant responded that he did not stab anybody. He was then placed under arrest.

A closed pocketknife was found by police immediately outside the front door. The parties stipulated that the pocketknife had a master blade 3¼ inches long and five-eights of an inch wide. Pathological examination disclosed that the cause of death was "secondary pneumonia, complicating stab wound of the abdomen-stomach, aorta, left renal artery, interior vena cava, and left renal vein * * *."

The parties also stipulated that defendant's T-shirt was stained with human blood of type B, blood type of the victim, and also with human blood of type A. The master blade of the pocketknife had traces of human blood of type B.

In behalf of defendant, a police officer testified that he first saw defendant wearing a bloody T-shirt in the doorway of the tavern. Defen-

dant also had a cut inside his left ear and there was blood in the lower part of this ear. The blood appeared to be dried.

Defendant agreed with the testimony of the witnesses for the State regarding the incident of the $5 bill which he stated he had placed upon the bar. Defendant also stated that he walked over to the end of the bar and asked to see the bartender's money to determine if that person had a $5 bill. The bartender exhibited the money in his pocket which was only single dollars. Defendant's conversation with the deceased, which resulted in a fight, then took place. Defendant did not know who struck the first blow. The fight lasted a couple of minutes and defendant was on the ground with arms extended and the deceased kneeling on his arms. Defendant was being choked by deceased. Defendant said then that he quit and did not want to fight any more. The deceased then let him up and defendant told the deceased that he had won "fair and square * * *."

The defendant then started to turn around to go home. When he was half turned, the deceased told him, "here's something to take with you * * *." The deceased then struck defendant a blow on the side of the head in the ear. Defendant was dazed but he kept on walking out the door. Defendant turned to the wall at the right alongside the door. While he was standing there, he happened to look up and saw the deceased standing in the doorway. The deceased remarked that defendant didn't "look that bad hurt * * *." Defendant responded, "that's no thanks to you * * *." Defendant also stated that he had quit and that he was going home. The deceased then said he was going to make sure that defendant did not come back. He struck defendant again on the side of his head with his hand. Defendant moved a little away and again told deceased that he had quit and that he just wanted to go home and wasn't going to come back. The deceased then struck defendant in the head with his fist so that defendant's head went back and hit the backboard behind him. Deceased then jumped at defendant, grabbed him about the neck and began to choke him. Defendant could not break the grip and could not breathe. Defendant then reached into his pocket, opened the knife and struck the victim once with it. The deceased then released his hold. Defendant leaned back but could not breathe at that time. Defendant then gave deceased a push and deceased moved inside the tavern. He went to the corner of the bar and fell over. Defendant went inside and looked at him. He later saw the police officers enter the tavern. Defendant told the police that he did not stab the deceased.

On cross-examination, defendant testified that he had been drinking beer during the evening and had a little less than 10 beers. Regarding

the origin of the fight inside the tavern, defendant testified that he and the deceased "struck each other almost simultaneously." Defendant testified that he pulled the knife out of his pocket with the right hand and then he was obliged to let go of the deceased to open the knife. At that time, deceased was right in front of defendant with his hands around defendant's neck.

■■ Our decision in this case must be reached after careful consideration of the following principles:

1. The issue of self-defense is generally a question for resolution by the trier of fact. *People v. Holtz*, 19 Ill.App.3d 781, 790, 313 N.E.2d 234, *leave to appeal*, denied 56 Ill.2d 589.

2. Self-defense is an affirmative defense. Ill. Rev. Stat. 1973, ch. 38, par. 7—14.

3. However, if the defendant presents "some evidence" tending to prove this affirmative defense, the burden then rests upon the State to prove guilt beyond a reasonable doubt as to that issue together with all other elements of the offense. (Ill. Rev. Stat. 1973, ch. 38, par. 3—2.) This matter is well set out in *People v. Williams*, 57 Ill.2d 239, 242, 311 N.E.2d 681. See also *People v. Warren*, 33 Ill.2d 168, 173, 210 N.E.2d 507.

4. When an individual is accosted by an aggressor, there is no requirement that such person retreat before employing force in his own defense. *People v. Williams*, 57 Ill.2d 239, 243, 311 N.E.2d 681.

5. Since the issue regarding self-defense is one of fact, this court will not set aside the finding reached by the trier of fact unless it is so unsatisfactory that it raises a reasonable doubt of the defendant's guilt. (*People v. Saunders*, 18 Ill.App.3d 117, 121, 309 N.E.2d 350.) Conversely, where the evidence leaves a reasonable doubt as to the guilt of the accused, the conviction should be set aside. *People v. Gokey*, 57 Ill.2d 433, 438, 312 N.E.2d 637; *People v. Garner*, 19 Ill.App.3d 728, 732, 312 N.E.2d 678.

The evidence in the case before us falls into two different subdivisions. First, we must consider the occurrence inside of the tavern and then we must turn to the incident outside the door. As regards the first encounter between defendant and deceased, the evidence is fairly clear. The bartender testified that defendant first struck deceased after the incident concerning the $5 bill. On the other hand, on cross-examination, the bartender stated that it was not clear exactly who give the first blow. Defendant testified that the blows by each adversary were almost simultaneous. It is clear that the brawl within the tavern was conducted without the use of weapons by either party; defendant was defeated and acknowledged that he had been overcome. It is also

clear that defendant then started to leave the place' and that the deceased followed. If deceased had remained behind, that may well have been the end of the entire confrontation.

However, the evidence is definite and corroborated that the deceased saw fit to follow defendant and that deceased then struck the first blow of what was to become a second and fatal encounter between these parties. The blow struck defendant on the left side of his head and was apparently so hard as to draw blood. The only witness to what transpired outside the door is the defendant himself. The bartender, who saw the parties leave and saw the initial blow being struck by the deceased while defendant's back was turned, estimated that 1 or 2 minutes elapsed between the time that deceased left the premises and the time that he reentered. The other patron who testified estimated that only 7 or 8 seconds elapsed between these two events. Neither estimate can be perfect or even accurate under the circumstances and the precise amount of time which elapsed is not greatly material.

As to defendant's testimony concerning the actual homicide, there is a strong indication that he used justifiable force in self-defense. His testimony that the deceased struck him without cause when his back was turned and when he was in the act of leaving the tavern is strongly corroborated by other testimony. Defendant's statement that he was being choked by the deceased is a good indication that he had fear for his life and that he acted in an effort to save himself. This is supported somewhat as the bartender saw the victim holding defendant by his neck during the initial encounter. The testimony of defendant, that he stabbed the deceased once in acting for his own safety, is corroborated by the official postmortem examination which showed that the deceased suffered one stab wound. Nor is defendant's testimony, that he reached into his pocket, took out his knife with one hand and then opened it with two hands, incredible or even difficult of belief. The defendant could readily desist from his efforts to remove the hands of deceased from his throat for a few seconds to open the knife.

Defendant's testimony regarding the homicide itself thus seems clear and probative and is corroborated in certain aspects. In our opinion, his version of the incident can be attacked in only one manner. There is some testimony that, when the police entered the tavern, they saw defendant bending over a pinball machine. Also, defendant told the police that he did not stab the deceased. His situation would have been improved if he had made a frank statement of self-defense to the police in an open manner. However, as against this, it must be admitted that defendant testified that he was dazed by the rough treatment given him

by the deceased and also it would be natural for him to be fearful of police action. Defendant testified that he had been previously convicted of a felony and sentenced to 3 years of probation which term he had completed.

■■■ As regards applicable principles of law, the cases hold that the trier of fact is not obliged to accept, as true, testimony concerning self-defense presented by the accused. (*People v. Holtz*, 19 Ill.App.3d 781, 790, 313 N.E.2d 234, *leave to appeal denied*, 56 Ill.2d 589.) On the other hand, a trier of fact should not disregard or reject testimony by defendant which is not improbable or contradicted in its material parts, especially where it is corroborated at least in part. Actually, the trier of fact may reject testimony by defendant which appears incredible if it is contradicted by facts and circumstances in the record or if it is so unreasonable as to be judged improbable. (*People v. Jordan*, 4 Ill.2d 155, 163, 122 N.E.2d 209.) In the record before us, defendant's testimony is neither incredible nor even improbable. It is corroborated in important particulars. In our opinion, this testimony, by the only eyewitness to the occurrence, may not be disregarded.

At this point we will review the principal authorities cited. The People rely most strongly on two cases. In *People v. Warren*, 33 Ill.2d 168, 210 N.E.2d 507, defendant did not testify. The sole and only evidence of self-defense appeared from exculpatory portions of a statement given by defendant to the police. However, these portions of the statement were so contradicted by other facts that the supreme court regarded them as "effectively impeached." (33 Ill.2d 168, 174.) In effect then, the conviction was affirmed because there was no real evidence on self-defense.

In *People v. French*, 3 Ill.App.3d 884, 279 N.E.2d 519, defendant testified that he was confronted by a group of armed youths and that he killed deceased only after he saw him reach for a gun. Five witnesses contradicted this and testified that defendant fired first. One of these individuals said that defendant was 50 feet from the deceased when he fired and that deceased was apparently unarmed. The case is factually inapposite.

The able and experienced trial judge relied principally on *People v. Brown*, 392 Ill. 519, 64 N.E.2d 739. There, defendant testified that he "cut" deceased three times. Actually deceased had been stabbed six times. Defendant drew his knife and deceased picked up a bottle. However, defendant not only stabbed the deceased before he lifted the bottle but stabbed him three times after the bottle was dropped. This indicates not only contradiction of defendant's testimony, but virtually

an admission by him that he used excessive and unnecessary force.

■■ On the other hand, we must apply to this record the principles first above set forth. Because of the very nature of the incident, the State produced no evidence regarding the fatal occurrence. On the contrary, defendant's own testimony presented strong proof of self-defense in that the force he used was justifiable and that his belief, that this conduct was necessary to save himself from imminent death or great bodily harm, was reasonable. Since defendant's belief was reasonable he was not required to use infallible judgment in the space of a few seconds while he was under great stress and excitement. (*People v. Bailey*, 27 Ill.App.3d 128, 135, 136, 326 N.E.2d 550, citing *People v. Motuzas*, 352 Ill. 340, 346, 185 N.E. 614.) In our opinion, the proof does not show the guilt of the defendant beyond a reasonable doubt. Analysis of the entire record leaves us with grave doubts concerning the guilt of the defendant. Consequently, it is our duty to reverse the judgment.

Judgment reversed.

BURKE, P. J., and SIMON, J., concur.