# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Lewis*, 2012 IL App (1st) 102089

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ORLANDO LEWIS, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-2089 |
| Filed | November 21, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction and sentence for second degree murder were upheld over his contention that he acted in self-defense, since the victim was not in a position to seriously harm defendant in a way that would justify defendant's deadly use of a firearm, and the sentence close to the maximum was appropriate in view of the gravity of the offense. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-19393; the Hon. Jorge Luis Alonso, Judge, presiding. |
| Judgment | Affirmed, mittimus corrected. |

Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Tomas G. Gonzalez, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Sari London, and Sara Dillery Hynes, Assistant State's Attorneys, of counsel), for the People.

Panel | JUSTICE TAYLOR delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Palmer concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial, defendant Orlando Lewis was found guilty of the second degree murder of Robert Thompkins and sentenced to 18 years' imprisonment. On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that he did not act in self-defense when Thompkins walked toward him after defendant displayed a gun. Defendant further contends that his sentence was excessive and that his mittimus should be reduced to reflect 1,032 days spent in presentencing custody. The State agrees that his mittimus should be corrected to 1,033 days. As to all other claims, the State disagrees.

¶ 2                              BACKGROUND

¶ 3    The record shows that defendant was charged with six counts of first degree murder in connection with an incident which occurred on October 14, 2006, on the south side of Chicago. At trial, the State called four occurrence witnesses, namely, Lateaccahe Temple, Sylvester Johnson, Fania Morrow and Cameron Wordlaw, who testified consistently. All four witnesses stated that the defendant and Thompkins had known each other for 15 years. Temple, Morrow and Johnson testified that in the evening of October 13, 2006, they had gone to the hospital, along with defendant, his brother Jeremy, and Thompkins, to visit a young man who was being treated for a gunshot wound suffered during a robbery. At the hospital, Thompkins told Jeremy that he was a "bitch" for sending the young man to commit that robbery instead of doing it himself. According to those witnesses, Thompkins then told Jeremy that they would handle that dispute "on the block," referring to 106th Street and Wabash in the city of Chicago.

¶ 4    According to all four occurrence witnesses, the group, which included Jeremy and Thompkins, as well as Morrow, Johnson and Wordlaw, gathered at or about 1 a.m. in an alley and vacant lot just south of 10641 South Wabash, where Temple resided. Thompkins and Jeremy began to argue in the street, and when the fight turned physical, they moved onto the sidewalk. At that time, defendant came running from his house and tried to break up the

-2-

fight. The four witnesses stated that defendant pulled a gun and pointed it to Thompkins, who was unarmed and standing two to four feet away from defendant. They all testified that Thompkins then told defendant that if he pulled out that gun, he better kill Thompkins, at which point defendant fired the gun at Thompkins at least twice before he fell on the ground, then shot Thompkins in the head while standing over him.

¶ 5        Temple, who observed the incident from her front porch about 20 feet away, stated that when defendant approached Thompkins and Jeremy, Thompkins walked away from the two brothers, and had his back to defendant when the defendant pulled out the gun and fired it at Thompkins. According to Temple, the first shot spun Thompkins around toward defendant, who shot Thompkins again, then knelt over him on the ground and shot him in the back of the head. Johnson, who saw the fight between Jeremy and Thompkins from 15 to 20 feet away, testified that when defendant ran to the scene, others had already separated Jeremy and Thompkins, but after Jeremy briefly spoke to defendant, the two began fighting again. According to Johnson, defendant got in the middle of the fight and Thompkins struck him twice before he pulled out the gun. Johnson stated, however, that Thompkins tried to run from defendant after the third or fourth shot, before falling to the ground. Similarly to Johnson's testimony, Morrow stated that Jeremy was backing off Thompkins when defendant arrived, but became more aggressive once defendant whispered something to him. According to Morrow, Thompkins then told defendant and Jeremy that he would beat them both, but she did not see Thompkins strike defendant. Wordlaw, who was playing chess at the alley about 15 feet away, testified that the fight turned physical after Thompkins took a swing at Jeremy, and that when defendant arrived, defendant tried to break up the ongoing fight. Wordlaw stated that Thompkins took a swing at defendant, who then took out his gun, and that Thompkins walked toward him with open palms and did not back down as defendant shot him several times. He further explained that everyone on the scene, including defendant, Thompkins and Jeremy, were friends who often engaged in fistfights without fear of anything worse.

¶ 6        Temple, Johnson and Wordlaw testified that after the shooting, Jeremy warned everyone at the scene not to report the incident or they would be killed as well. Jeremy, who testified for the defense, admitted that he and defendant fled to Windsor, Canada, shortly after the incident and did not return to Chicago until July of 2007.

¶ 7        William Dunigan, a forensic investigator, testified that he recovered a spent bullet near Thompkins' body, and that both Thompkins' hands tested positive for gunshot residue. Scott Rochowicz, a forensic scientist, explained that those results meant that Thompkins had either discharged a firearm or was in close proximity when it was discharged. Rochowicz further stated that gunsmoke can be transferred from one person to another, and can travel up to 10 feet. Dr. Nancy Jones, who performed an autopsy on Thompkins, testified that she recovered three bullets from his body: one from the right side of his head, one from his right buttock and one from the area near his right armpit and upper back. Her exam of the body revealed corresponding gunshot wounds on the left side of the back of his head, his right hip and the inside of his right arm at the elbow. Dr. Jones further stated that the bullet recovered from Thompkins' head traveled through his brain, from the back of his head toward the front.

¶ 8        Defendant, who testified on his own behalf, stated at trial that he had known Thompkins

from the block for about 15 years, and they were both members of the Four Corner Hustlers street gang. He admitted that until the night in question, he had never been afraid of Thompkins. While defendant acknowledged that he had a gun that night, he explained that he had taken it from a group of younger men who were about to use it to resolve a dispute. Defendant stated that he still had that gun when he saw Jeremy and Thompkins fighting and ran to the scene to break up the fight. Defendant explained that once he separated Jeremy and Thompkins, and told Jeremy to go home, Thompkins grabbed defendant and began choking him. When defendant broke free, Thompkins punched him in the face. According to defendant, he then tried walking away, but Thompkins advanced toward him, at which time defendant pulled out his gun and pointed it at Thompkins, stating "we can do this a better way." Defendant stated that Thompkins kept walking toward him and responded with comments such as "bitch, you better kill me." He testified that Thompkins then "lunged" at him and tried to take the gun, and defendant fired the gun at Thompkins three or four times. Defendant denied shooting Thompkins once he was lying on the ground.

¶ 9    On cross-examination, defendant admitted that he knew that Thompkins did not have a gun, but stated that he was still afraid to turn and leave the area after he separated Thompkins and Jeremy. He also acknowledged disposing of the gun shortly after the shooting and leaving for Windsor with Jeremy.

¶ 10    In addition, defendant related four incidents in which he observed Thompkins strike other individuals. According to defendant, in 1999 or 2000, he saw Thompkins beat a man over money, and in 2002 or 2003, he saw Thompkins hit a man who tried to sell him a chain. Further, in 2005, defendant saw Thompkins attack a man who won money from him gambling, and in an unrelated incident, Thompkins struck another man in the head with a gun. However, he admitted that he had never seen Thompkins threaten those men with a gun and that Thompkins never used a gun on his fellow gang members.

¶ 11    The defense also called three police officers who had prior encounters with Thompkins. Officer Davis testified that in September, 2003, he apprehended Thompkins for drinking in a public way, and when he and his partner placed him in the wagon after a struggle, Thompkins dropped a handgun on the street. Officer Riggins, the lockup officer for that 2003 incident, testified that once Thompkins arrived at the station, he was cursing and spitting on officers. Thompkins struck the officer in the face, and when officers tried to close the cell door on Thompkins, he slammed the door on Officer Riggins' arm, fracturing it. Lastly, Officer McWilliams testified that in December 1999, he responded to a domestic disturbance call involving Thompkins, and observed him in a fistfight with his brother. When Officer McWilliams' female partner attempted to break up the fight, Thompkins struck her repeatedly.

¶ 12    Following closing arguments, the trial court found defendant guilty of the lesser included offense of second degree murder, holding that the evidence showed that while defendant was acting in the belief of self-defense, that belief was not reasonable. In doing so, the court stated that while the four occurrence witnesses' testimony contained inconsistencies, it provided a clear picture of what happened the night in question and was more credible than defendant's own trial testimony. In fact, the court found that the State proved that defendant had the intent to kill or do great bodily harm to Thompkins and was not justified in using

-4-

deadly force. However, it also found that the defense proved by a preponderance of the evidence the existence of a mitigating factor so as to allow defendant to be found guilty of the second, rather than first, degree murder. The court further stated that since the medical examiner did not find evidence of close-range firing to the back of Thompkins' head, it would give defendant "the benefit of the doubt" as to whether defendant kneeled over Thompkins on the ground. In addition, the court noted that defendant's flight to Canada was further evidence that he knew he was guilty.

¶ 13    At sentencing, the State noted that defendant chose to join a fistfight with a man whom he had known for years and never been afraid of, chose to bring a firearm, and chose to shoot Thompkins three times. Defense counsel pointed out that defendant had no prior convictions for violent crimes, but only for drug possession. He also noted that defendant had a prior work history and family support. Defendant apologized to Thompkins' family and expressed remorse. The court sentenced defendant to 18 years' imprisonment, noting that it had given him the "benefit of the doubt" when it reduced his crime to second degree murder, and that such a sentence was appropriate taking into account all the factors in aggravation and mitigation. Defendant was then credited with 1,003 days spent in custody. He filed a motion to reconsider the sentence, which was denied.

¶ 14                                                ANALYSIS

¶ 15    On appeal from that judgment, defendant now contends that the State failed to prove beyond a reasonable doubt that he did not act in self-defense in shooting Thompkins, who kept coming at defendant even after he displayed a gun to break up the ongoing fistfight. Defendant maintains that the evidence presented at trial showed that defendant's actions were justified because he believed that he and his brother were in imminent danger of death or great bodily harm when Thompkins kept advancing toward him.

¶ 16    Where a defendant challenges the sufficiency of the evidence to sustain a conviction, we determine whether any rational trier of fact, after viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224, 920 N.E.2d 233, 240 (2009). This standard recognizes the responsibility of the trier of fact to resolve conflicts in the evidence, to determine the credibility of the witnesses and the weight of their testimony, and to draw reasonable inferences therefrom. *People v. Williams*, 193 Ill. 2d 306, 338, 739 N.E.2d 455, 472 (2000). Accordingly, this court will not substitute its judgment for that of the trier of fact as to the weight of the evidence or the credibility of the witnesses, or set aside a criminal conviction unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt as to defendant's guilt. *Siguenza-Brito*, 235 Ill. 2d at 224-25, 920 N.E.2d at 240. We do not find this to be such a case.

¶ 17    Self-defense is an affirmative defense, and once defendant raises it and provides some evidence of it, the State has the burden of proving beyond a reasonable doubt that defendant did not act in self-defense, in addition to the elements of the charged offense. *People v. Jeffries*, 164 Ill. 2d 104, 127, 646 N.E.2d 587, 597 (1995). In Illinois, a person is justified in using deadly force only when he reasonably believes that such force is necessary to prevent

imminent death or great bodily harm to himself or another person, or the force threatened is a forcible felony. 720 ILCS 5/7-1 (West 2004). Thus, a person acts in self-defense where: (1) force was threatened against defendant; (2) defendant was not the aggressor; (3) the danger of harm was imminent; (4) the force threatened was unlawful; (5) defendant actually believed a danger existed and the use of force was necessary to avert it; and (6) defendant's belief was reasonable. 720 ILCS 5/7-1 (West 2006); see also *People v. Morgan*, 187 Ill. 2d 500, 533, 719 N.E.2d 681, 700 (1999). If the State negates any of the above elements, defendant's claim of self-defense fails. *Jeffries*, 164 Ill. 2d at 127-28, 646 N.E.2d at 597-98. Where a defendant shoots an unarmed victim, who was not in a position to cause great bodily harm, a fact finder may rationally conclude that any belief of imminent danger so as to justify the use of deadly force was unreasonable. See, *e.g.*, *People v. Davis*, 33 Ill. App. 3d 105, 109-10, 337 N.E.2d 256, 260 (1975) (defendant's belief that an unarmed man was about to cause her great bodily harm was unreasonable, and she was not justified in shooting him, even after he threatened to kill her, walked after her and snatched off her wig); *People v. Lee*, 243 Ill. App. 3d 1038, 1043, 614 N.E.2d 108, 112 (1993) (fact finder may have found that unarmed victim could not have threatened great harm against defendant so as to justify shooting the victim, even after a fistfight started by the victim).

¶ 18    In this case, the evidence, shown in the light most favorable to the State, shows that defendant instigated his brother to fight Thompkins after their initial fistfight had been broken up, and then intruded upon the second fight between the two men. Further, the evidence shows that when defendant pulled his gun and pointed it at Thompkins, he knew that Thompkins was unarmed and that Thompkins had never shot at a fellow gang member in the past. While it appears that Thompkins told defendant that if he pulled a gun on him, he "better kill [Thompkins]," that statement, when viewed in the light most favorable to the prosecution, does not necessarily indicate that Thompkins was about to shoot defendant with that gun, but could have been a threat to merely hit defendant, or to seek revenge at a later time. Moreover, instead of reporting the incident to the police, defendant fled to Canada, which further indicates that he knew the shooting was not justified. Thus, even if Thompkins kept walking toward defendant after he pointed the gun at him, a rational trier of fact could have concluded that if defendant believed that deadly force was necessary to avert imminent danger, such belief was unreasonable.

¶ 19    Defendant's reliance on *People v. Harling*, 29 Ill. App. 3d 1053, 331 N.E.2d 653 (1975), and *People v. Bailey*, 27 Ill. App. 3d 128, 326 N.E.2d 550 (1975), is misplaced. The defendant in *Harling*, 29 Ill. App. 3d at 1058, 331 N.E.2d at 558 was the only witness to the fatal stabbing of the victim while they were engaged in mutual combat, unlike defendant in this case, who shot an unarmed Thompkins from two to four feet away. In *Bailey*, 27 Ill. App. 3d at 133-34, 326 N.E.2d at 554, there were two men advancing toward defendant, blocking his only exit and threatening to push him out of a third-story window immediately behind defendant. Thompkins, by contrast, was not in a position to cause any great harm to defendant so as to justify the defendant's use of a deadly weapon.

¶ 20    Defendant next contends that his 18-year sentence for second degree murder was excessive and that this court should reduce his sentence to a more appropriate term or remand his case for resentencing. He contends that a sentence that is only two years shorter than the

maximum sentence allowed for this offense is excessive in light of the facts that he has no history of violent crimes, has a steady family and employment history, and has expressed remorse for his crime.

¶ 21 It is well established that trial courts have broad discretionary powers in imposing a sentence, and that their sentencing decisions are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010). A reviewing court may not substitute its own judgment absent an abuse of discretion, which will be found only if the judgment of the trial court is manifestly unjust or the defendant's sentence constitutes a clear departure from fundamental law or is not proportional to the nature of the offense. *People v. Henderson*, 354 Ill. App. 3d 8, 19, 820 N.E.2d 108, 117 (2004).

¶ 22 In this case, defense counsel presented evidence of defendant's prior employment history, family ties, lack of a violent criminal history and remorse for his crime. In aggravation, the State noted the nature and circumstances of the crime, namely, that defendant chose to join a fight between his brother and Thompkins, to bring a firearm, and to fire it at an unarmed Thompkins repeatedly. The State further noted that the trial court had already given defendant the benefit of the doubt in finding him guilty of second, rather than first, degree murder. In sentencing defendant to 18 years' imprisonment, which is within the statutory limits for second degree murder (730 ILCS 5/5-8-1(a)(1.5) (West 2006)), the trial court stated that it considered all the factors in aggravation and mitigation, including defendant's criminal history, the financial impact of his incarceration as well as his statement of remorse. It then noted that a sentence close to the maximum range was appropriate given the facts and seriousness of the crime. Under these circumstances, we conclude that the trial court did not abuse its discretion in imposing defendant's sentence.

¶ 23 Lastly, defendant contends that his mittimus should be corrected to reflect 1,032 days of spent in presentencing custody, instead of the 1,003 days currently reflected therein. The question of whether defendant's mittimus should be corrected is a purely legal issue, subject to *de novo* review (*People v. Jones*, 397 Ill. App. 3d 651, 656, 921 N.E.2d 768, 772 (2009)), and this court has the authority to order the clerk of the circuit court to issue a corrected mittimus (Ill. S. Ct. R. 615(b)(1)). The record shows that defendant was arrested on August 27, 2007, and remained in custody until the day he was sentenced on June 25, 2010. The State correctly notes that, excluding the day that he was sentenced, defendant was in custody for a total of 1,033 days. Accordingly, we order the mittimus to be amended to reflect 1,033 days of credit.

¶ 24 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County, and order the mittimus to be amended to show 1,033 days served.

¶ 25 Affirmed, mittimus corrected.